**DONALDSON COMPANY, INC., Plaintiff,**

v.

**PNEUMAFIL CORPORATION, Defendant.**

No. C–C–82–691–M.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 13, 1985.

E. Osborne Ayscue, Jr., Helms, Mulliss & Johnston, Charlotte, N.C., Alan G. Carlson, Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, Minn., for plaintiff.

Francis M. Pinckney, Richards, Shefte & Pinckney, Charlotte, N.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

This case came on for trial before the court without a jury on August 13–16, 1984. It is an action for infringement of U.S. Patent No. 4,218,227, granted to Robert E. Frey, assigned to plaintiff Donaldson Company, Inc., and allegedly infringed by defendant Pneumafil Corporation. The alleged invention is a type of industrial dust collector which is embodied in a cylindrical cartridge with pleated paper filters cleaned by a pulse jet mechanism. Defendant answers and counterclaims, alleging invalidity of the patent, and denying infringement even were the patent to be found valid.

The patent here challenged is entitled to a presumption of validity. 35 U.S.C. § 282 provides:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

■ During the course of this litigation and the court's determination on the merits, the burden of proof, both in coming forward with evidence and in persuading the court of the patent's invalidity, has remained with the defendant. The ultimate question addressed is whether defendant has met that burden of proving that the patent is invalid. *Stratoflex, Inc. v. Aeroquip Corporation*, 713 F.2d 1530, 1534 (Fed.Cir.1983).

Defendant has met that burden.

On the basis of the evidence presented at trial, the court makes the following findings of fact and conclusions of law.

## BACKGROUND

Dust collectors are used to remove particles from dust or particulate-laden air or gas stream. The type of dust collectors involved in this suit historically have been used in industrial settings to clean air containing wastes from the production process and (at times) to recapture valuable particulates released into the air by industrial processes and they recently have found a new market in the Middle East for use in cleaning the air intakes to turbine engines used in the oil industry.

Dust collectors are enclosed in housings with an inlet to receive dirty air and an outlet to discharge clean air. The filtering is done within the housing by filter elements which separate the dust and particulate matter from the air. Until 1970, the predominant and perhaps only type of filter

used in industrial applications was a fabric filter in a narrow bag shape. A group of such filters might be housed in a baghouse.

A filter is usable until it is physically damaged or becomes so caked with dust that it offers an unacceptable resistance (called the "pressure drop" or Delta P) to the flow of the particulate-laden air through the filter. The resistance becomes "unacceptable" when the cost of the amount of power required to operate the fan to move the air through the collector becomes prohibitive or when the fan simply is unable to move the air at all and the system stops filtering.

The other major variable involved in use of air filters is *the rate at which the air flows through the filter.* Air flow (Q) is measured in cubic feet per minute and is the product of the velocity through the face of the filter (V), measured in feet per minute, multiplied by the face area of the filter (A), measured in square feet. This equation is often expressed as air-to-cloth ratio (Q/A) which is the same as the face velocity, since $Q/A = V$. In general, the air-to-cloth ratio is increased as the size of the particulate matter increases. The efficiency of the filtering and cleaning process and the cost of the filtering system (measured by the cost of the energy required to run the fan) is generally considered to be enhanced by a low air-to-cloth ratio.

Conversely, the higher the air-to-cloth ratio (up to a point), the more the air that can be cleaned per foot of filtering material, and the cheaper the initial cost outlay for the filters, the less the filter material required and the "quicker" the air will be filtered. At a certain point, however, the pressure drop, or resistance to the air flow, becomes so great that the system "blinds," and the filter is unable to perform its function.

In order to increase the life of the filter, to allow for continuous air cleaning, and to reduce the cost of pushing the air through the filtering system, engineers developed methods for cleaning the filter on a regular, continuous basis while the system continued to filter the air. The first cleaning mechanism was one which physically shook the baghouse to dislodge the dirt which had accumulated during filtering. In the 1950's, a mechanism called a "blow ring collector" was developed; a tubular ring encircled the fabric bag filter, and the ring was mechanically driven up and down along the filter. Compressed air was directed through a slot in the tubular ring against the bag; the dirt, which was collected on the inside of the bag, was dislodged as the ring moved along the outside surface and compressed air was forced from the outside to the inside of the bag.

In the 1960's, the pulse jet baghouse collector became, and it remains, the most widely used dust collector. In this type of collector, the dirt is collected on the outside of the filter. To clean the filter, brief pulses of compressed air are introduced into the interior of the bag. Although engineers in the field disagree on the exact way in which the pulse jet mechanism works to clean the filter, there are two actions which appear to take place to cause the dust to be forced off the outside of the bag—the pulse of compressed air causes the bag to flex or snap outward, breaking apart the dust cake that formed on the bag and shaking off the dust, and the "reverse air flow" inside the bag blows the dust off the outside.

In 1969, J.R. Spriggs, an employee of plaintiff Donaldson Company, Inc., filed an application for a patent for a "cleaning apparatus for fluid filters." The patent was granted on March 9, 1971, and an embodiment of the patent, the Quik-Change filter, was marketed by Donaldson beginning in 1971. The Spriggs patent was summarized as intending to clean "tubular-shaped, permeable fluid filters and the like wherein a nozzle is mounted within the permeable filter so as to direct a jet of fluid in a generally reverse direction through the fluid filter" with one of its objects being "to provide cleaning apparatus which can withstand relatively high pressures with little to no leakage of the various parts therein" (Defendant's Exhibit 8). The type of cleaning mechanism used in this invention is generally known as a reverse jet rather than a pulse jet mechanism.

Although the Spriggs patent itself did not specify the type of filter or filter housing to be used, the physical embodiment of the Spriggs patent, the Quik-Change device, was a cylindrical cartridge with a pleated paper filter, rather than an elongated fabric bag filter such as those which had been in common use in the industry. In addition, though prior baghouse filters had generally been utilized at 5 to 15 feet per minute air-to-cloth ratio, the Quik-Change device was advertised to run at .7 to 7 feet per minute air-to-cloth ratio. In a 1971 Donaldson internal memorandum comparing the Quik-Change device with "conventional filter units," the air-to-cloth ratio was said to be about 3:1 for the present media for the Quik-Change whereas the air-to-cloth ratio for the conventional filter units was said to be "usually less than 5:1 for woven filter media and greater than 5:1 for felted media. A reported 46% of all applications are running between 2:1 and 6:1. Half are operating at ratios about 6:1 with only 5% below 2:1" (Defendant's Exhibit 64, p. 19).

The Quik-Change device was not a commercial success for Donaldson. Frank Chase, currently corporate vice-president of Donaldson, came to Donaldson in 1974 when Torit, a company of which he was president, was acquired by Donaldson. When he came to Donaldson, the division in which the Quik-Change device was being developed came under his control. "I tried to end that particular project and product. I had concern about the mechanical workings of the innards ... the jet" because of the likely wear and eventual destruction of the jet (housed inside the filter) by abrasive materials entering the filter. He testified that "I was concerned about that as soon as I saw it" (Transcript at 244).

### THE INVENTION

Robert Frey, the applicant for the patent in question in this suit, testified that

The thing that I invented really is a means to use that cartridge [the pleated paper cartridge] in a completely automatic dust collector using the pulse jet principle. Now, that doesn't sound like much more than the simple substitution of cartridge for bags, but it's a lot more than that because that cartridge needs to be operated at a very, very low velocity of filtration in order to be cleaned on a continuous basis.

Transcript at 41.

Defendant contends that plaintiff's "invention" was obvious and was taught by prior art and that plaintiff made material misrepresentations to the patent office in pursuing its application, including a failure to make adequate disclosure of prior art and a failure to reveal material test results that contradicted conclusions advanced in support of the application which were made on the basis of other test results.

### OBVIOUSNESS

Defendant's first claim as to the invalidity of the patent is based on its assertion that the invention set forth in the challenged patent would have been obvious under 35 U.S.C. § 103, set forth below:

§ 103. *Conditions for patentability; non-obvious subject matter*

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

▮ Proper analysis of a claim of invalidity based upon § 103 "obviousness" is made under the guidelines set out in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965):

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issues are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is deter-

mined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. *Id.* at 17–18, 86 S.Ct. at 694. Evidence arising out of the "secondary considerations," when present, must be considered in making a determination of obviousness. *Stratoflex, Inc. v. Aeroquip Corporation, supra* at 1538.

In considering whether the subject matter of the invention as a whole would have been obvious to a person of ordinary skill in the relevant art, the court must presume that the person would have had all relevant prior art before him, whether or not that prior art was actually known to the inventor. The test of obviousness is whether, focusing on the state of the art at the time the invention was made, "the claimed invention, considered as a whole, would have been obvious or nonobvious." *Jones v. Hardy,* 727 F.2d 1524, 1529 (Fed.Cir.1984). The claims being examined must be read and construed in light of the specification and the prosecution history of the patent. *ACS Hospital Systems Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1577 (Fed.Cir.1984).

> What matters in the § 103 nonobviousness determination is whether a person of ordinary skill in the art, having all of the teachings of the references before him, is able to produce the structure defined by the claim.

*Orthopedic Equipment Corporation, Inc. v. United States,* 702 F.2d 1005, 1013 (Fed. Cir.1983).

### Scope and Content of the Prior Art

The scope of the prior art is that "reasonably pertinent to the particular problem with which the inventor was involved." *In re Wood,* 599 F.2d 1032, 1036 (Cust. & Pat.App.1979), cited in *Stratoflex, Inc. v. Aeroquip Corporation, supra* at 1535. The problem confronting Frey was to achieve efficient air filtration using a pleated paper cartridge filter and to clean that filter efficiently (with regard as to both time and preservation of the filter) by use of a pressurized release of fluid. The reasonably pertinent prior art was those filtration devices (1) employing pleated paper filters which were cleaned or capable of being cleaned; (2) employing pressurized fluid cleaning mechanisms; and (3) being run at a "de-rated" filtration velocity.

### Prior Art

The most material prior art was the Spriggs patent and its commercial embodiment, the Quik-Change dust collector. The Quik-Change collector, developed by plaintiff, was the first industrial dust collector to use a cartridge with a pleated paper filter rather than the standard fabric baghouse. Prior use had been made of pleated paper cartridges in trucks and off-road vehicles. However, in those usages no attempts were made to clean the filters, and the filters would simply be discarded and replaced when too much dirt had built up to allow further filtering. Frey testified that he claims no invention by the use of *pleated paper cartridges* (Tr. 82).

Frey also claims no invention from the use of *pressurized fluid cleaning mechanisms.* The pulse jet system was already in use, and even Spriggs' reverse jet mechanism employed in the Quik-Change was a pressurized fluid cleaning device. Other relevant prior art is cited in the June, 1978, rejection of plaintiff's third patent application (prior to amendment) (Defendant's Exhibit 24, "O.A. 6/26/78").

Although the patents of the relevant prior art did not specifically set out the "de-rating" principle, all prior self-cleaning filter systems were "rated" for a particular filtration *velocity* depending on the materials used. In fact, as will be discussed below, the patent examiner found that the *"degree of 'derating' is considered to be an obvious matter of choice or design to the skilled artisan. " Id.*

The Quik-Change device was acknowledged by plaintiff's staff to have an air-to-cloth ratio or face velocity of about 3 feet per minute. At the time, because of pres-

sure in the industry to have less filter do more work more quickly, that was considered to be a disadvantage. However, the fact that the references had not previously been combined for economic reasons does not mean that they were technologically incompatible. *Orthopedic Equipment Corporation, Inc. v. United States*, 702 F.2d 1005, 1013 (Fed.Cir.1983).

In addition, in comparing the Quik-Change with "conventional filter units," *plaintiff's* 1971 analysis concluded that the lower air-to-cloth ratio for the Quik-Change "is not directly comparable with competition because our overall favorable unit size [because of the pleats, a pleated paper filter cartridge contains more square feet of filter than a few bags] and cost vs. air-flow capacity is the key factor, not the air-to-cloth ratio" (Defendant's Exhibit 64 at 19). The Quik-Change device was advertised to run at a air-to-cloth ratio/face velocity of .7 feet/minute to 7 feet/minute, depending on the dust to be cleaned (Defendant's Exhibit 14A).

[Plaintiff's Exhibit 190 at exhibits 3 and 4 lists the "Q" factor, flow through a filter in cubic feet/minute for the Quik-Change as it was used with various types of dust. From those figures, counsel for both sides tried to show that the air-to-cloth ratio/face velocities were on the average either higher (plaintiff) or lower (defendant) than 3 feet per minute. The critical factor, since Q was given, was the *area* of the filter. In the report itself, at 1928, the "current" size of the media is described as being 120 feet. Using this figure as the area or A in the equation, most of the face velocities would be above 5. Defendant showed in other exhibits, that the Quik-Change was advertised as containing 168 feet of filter in a cartridge (Defendant's Exhibit 14A) and that as of January 26, 1972, from a communication from a customer, the "actual" area of the filter was 168 square feet (Defendant's Exhibit 112 at 3, Transcript at 325). This controversy remains unresolved; however, this and other evidence indicates that plaintiff itself contemplated that the Quik-Change device would have to be run, and that it was run, at the lower face velocities.]

## Differences Between Claimed Invention and Prior Art

■ The question under § 103 is *not* whether the differences between the claimed invention and the prior art would have been obvious. Rather, "consideration of differences … is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious." *Stratoflex, Inc. v. Aeroquip Corporation, supra* at 1537. The particular difference itself might be slight but may have been the "key to success" of the invention; it is irrelevant that all aspects of the claim other than the "different" aspect were well known in the art. *Jones v. Hardy, supra* at 1528.

The difference here between the Frey invention and the Spriggs invention, in its commercial embodiment, was the use of a pulse jet cleaning mechanism rather than a reverse jet cleaning mechanism and the employment of the concept of "de-rating." Spriggs already had made use of the pleated paper cartridge filter, although he had employed a reverse jet, rather than a pulse jet, cleaning mechanism. The Quik-Change, by the admission of the plaintiff, who owned the Spriggs patent, was used with an air velocity of one to seven feet per minute (fpm). Under the Frey patent, the air velocity should be confined to a range of 1 to 3 fpm.

The critical difference between the Spriggs/Quik-Change device and Frey's invention was the type of cleaning mechanism employed. Frey chose to use the pulse jet, the most widely used of the cleaning mechanisms of the time, instead of the reverse jet. Spriggs testified that he "didn't think it was obvious" to substitute a pulse jet for the rotating nozzle on the reverse jet mechanism (Tr. 288). However, he had been aware in 1971 that the major problem with the Quik-Change was that there were mechanical problems with the nozzle mechanism having to go up and down inside the filter (Tr. 283), and he had himself at one time tested cleaning a pleated paper filter cartridge with a pulse jet (Tr. 288). When doing that test, he had

had in mind an application for vehicles. He ran the test at 7 feet per minute face velocity (Tr. 289). The range of face velocities for truck filters was 5 to 10 feet per minute (Tr. 291).

In addition, in a report in 1971 (Defendant's Exhibit 37 at 31), Spriggs had said, in regards to the pulse jet cleaner, "in view of the potential simplicity of the blast and vibration techniques, it is strongly recommended that SCAC's [Self-Cleaning Air Cleaner] incorporating these mechanisms be investigated" (Tr. 287). The pulse jet cleaner was already widely in use in the baghouse cleaners; the obvious implication of this statement, though denied by Spriggs, is that he was strongly recommending investigation of the use of the pulse jet in the Quik-Change *pleated paper filter cartridge* device.

Frey traces his invention from a tour of a Donaldson truck filter facility in 1973 when he saw a pleated paper truck filter and wondered if it could be adapted for use in an industrial setting (Tr. 61). The face velocity that he selected for his first cleaning test was one foot per minute. In *retrospect*, he labelled this a "grossly derated" velocity because he was dealing with a material (carbon black) that was "normally" cleaned with a face velocity of nine feet per minute (Tr. 64). He also testified that the "derating" was from the "normal" use of the cartridge in the truck filtering system. In "discovering the way that cartridge can be used in a pulse jet cleaning system," Frey testified, the "key element in that was that the velocities that we have been talking about have to be extremely low in order for the cartridge to be cleaned and used continuously" (Tr. 54).

However, as set out above, Donaldson had already recognized that cleaning of a cartridge would have to take place at lower face velocities than cleaning of baghouse filters (Defendant's Exhibit 64). Plaintiff provided no evidence that pulse jet cleaning (utilized in the Frey patent) is materially different from reverse jet cleaning (utilized in the Spriggs patent) on the critical issue of the relevant face velocities and on the stress produced on the filter to be cleaned. In fact, Frey testified that the reverse jet might, under some circumstances, place more stress on the cartridge than the pulse jet (Tr. 129).

*Level of Ordinary Skill*

■ The level of ordinary skill is relevant to the inquiry whether or not the invention, as a whole, would have been obvious "to one of ordinary skill in the art." 35 U.S.C. § 103. Some of the factors to be considered are the various prior art approaches, the type of problems encountered in the art, the rapidity of innovations in the art, the sophistication of the technology involved in the art, the educational background of those active in the field and the commercial success or failure of other attempts to solve the problem met by the invention. *Orthopedic Equipment Corporation, Inc. v. United States*, 702 F.2d 1005, 1011–1012 (Fed.Cir.1983).

The level of ordinary skill involved in this case is that of an engineer having substantial experience in the air filtration field.

*Secondary Considerations*

■ As set out above, the court must consider evidence of secondary considerations of such things as commercial success of the invention, the fact that others skilled in the art tried and failed to find a solution to the problem, a "teaching away" in the prior art of the concepts leading to the invention, a long-felt need for the invention or an admission of infringement. Before the evidence on secondary considerations will be given substantial weight towards a conclusion of nonobviousness, a nexus must be shown between the merits of the claimed invention and the evidence offered. *Stratoflex, Inc. v. Aeroquip Corporation, supra* at 1538.

In this case, plaintiff put forth some evidence that it has had commercial succcess with the application of the Frey patent—in particular, in the Middle East in power plants using turbine engines (Plaintiff's Exhibits 131 and 172, under seal at #27A in file). Sidney Orem, Director of the Gas Cleaning Institute, testified that the commercial embodiment of the Frey

patent was successful but somewhat restricted in application and that the baghouse filter is still "the accepted device" in conventional dust collecting" (Tr. 307). Similarly, Larry Stevenson, a sales manager for defendant, testified that the cartridge had been successful in its specific applications but had not "overwhelmed" the industry (Tr. 595).

Plaintiff presented no convincing evidence that the Frey's innovation solved a problem that others had attempted unsuccessfully to solve on any concentrated basis before that time or that it satisfied a "long felt need" in the industry. Defendant presented credible evidence that it was developing a similar filter for the gas turbine industry in 1979 and that the news of Frey's patent brought no startling revelations.

The court does not find that Frey's work represented *no* improvement or innovation over other filters in its particular application. Rather, the court finds that the evidence of secondary considerations such as commercial success and prior efforts at solving similar problems are not such in this case to tilt the scale of decision toward a finding of non-obviousness under the *Graham v. John Deere* test.

### Analysis

In essence, the heart of plaintiff's claim is that there was nothing in the prior art which taught the correct ratios for pulse jet cleaning of the cartridges. Plaintiff is not claiming that Frey invented or discovered the equation for determining proper face values but only that it was invention to have determined, in initially testing the cartridge for cleaning, that a lower face velocity would be necessary for cleaning.

When asked what led him to test the filter at a lower than usual face velocity at first, Frey testified, "I assumed that if run at a low enough velocity, the cartridge might be cleaned. That was the basic lead into the test.... [I]t is hard to say where that came from.... In the past, when new media came along, you typically start at a normal operating point" (Tr. 111). He testified that if he had initially tested the product at the "normal" velocity for off-road vehicles, "the test would not have worked, and the chances are it would have never come to a product." When he later tried to run the test at eight to ten feet per minute, the test failed because "the cartridge was uncleanable at that high ratio.... [it] went to a pressure drop beyond the fan's capability" (Tr. 112). The tests did not produce a rupture of the filter material, however, because "it will blind [fail to operate] before you can continue operation" (Tr. 115).

Sidney Orem, Director of the Gas Cleaning Institute and involved in dust collection industry from 1946 to the present, testified for the plaintiff that, in his opinion, it would not have been obvious for one with ordinary skills, to have made the Frey invention at the time of invention (Tr. 306) and that at the time the Frey invention was first known of, there was considerable opinion expressed in the field, including by himself, that paper filters could not be cleaned (Tr. 305). He also testified, however, that when he first saw Frey's invention and expressed that opinion, he was not aware of the Quik-Change device (Tr. 306).

Lewis Hough, a chief engineer at Wix Corporation, which manufactures truck filters and which helped defendant develop its version of the pleated paper filter cartridge, testified that he had never heard the term "derating" used before seeing plaintiff's patent and that the air-to-cloth ratio for any particular application would simply depend on the purpose to which the filter was being put (Tr. 429).

Roy Paretone, an engineer with defendant, testified that he would have considered the pulse jet cleaned cartridge to have been the first major innovation in the industry in some time *unless he had known about the Spriggs patent* (Tr. 448–449).

All of the other witnesses (those called by both plaintiff and defendant) testified that the critical innovation was the use of the paper pleated cartridge, not the choice of the pulse jet cleaning of that cartridge nor the choice of face velocities for the filtering function. Face velocity was deter-

mined by *determining* first how many cubic feet of air per minute (Q) the user of the filter needed to clean and the desired pressure drop (amount of energy it will take to overcome resistance of air through filter) (Tr. 534) then *adjusting* the area (A) and the face velocity (V) to achieve that air flow while suggesting a maximum face velocity to achieve maximum efficiency (Tr. 465, 524). If the face velocity is allowed to rise too high, the pressure drop (resistance to the air through the filter) will shut down the system (blinding). This is true with any form of filtering (Tr. 524, 569) and when there is no cleaning at all of the filter (Tr. 508). None of the witnesses had ever experienced destruction of the media due to running the filter at too high a face velocity (Tr. 404, 466, 530, 585); instead, tests running at eight to nine feet per minute resulted in the filter "blinding out" (Tr. 563, 564, 587). Frank Storey testified that this phenomenon was common knowledge in 1972 (Tr. 571).

The "normal" filtering function of any filter was described as "to take the dust out of the air" (Tr. Tr. 534). Therefore, the term "derating" was said to have no meaning since a rating is set for each function. Harry Bar, defendant's vice president with thirty-one years of experience in the industry, testified that it was obvious to substitute the pulse jet for the Quik-Change rotating reverse jet nozzle and that, after performing tests, it would be obvious to run the cartridge filter at between one and three feet per minute because the paper filter would obviously be more difficult to clean than the baghouse filter. The type of cleaning mechanism, reverse jet v. pulse jet, would not make a great difference in the face velocity (Tr. 573). Rapid wear of filters is not generally a problem in the industry except where the mechanisms to clean are mis-designed (Tr. 584).

Parker Reist, a professor of environmental science and engineering at the University of North Carolina, testified as an expert in the dust cleaning field. His opinion was that the pulse jet cleaning process worked primarily because of the "shock wave" and resulting vibration of the filter media caused by the jet of compressed air, rather than because of a reduced pressure drop, as proposed by Frey (Tr. 607). In all of his tests, he found that stress on the paper filter by use of the pulse jet was quite low, even at high face velocities of eight to ten feet per minute and that the real problem was blinding (Tr. 609).

Reist described the normal technique to determine air-to-cloth ratios/face velocities as being, *first* to decide on filter size, and *then,* to get the desired performance, to vary the air-to-cloth ratio/face velocity. Although it is not immediately obvious what face velocity to run a particular filter out, *it is obvious to test the filter at different face velocities to find the most appropriate one* (Tr. 625–626). Generally *efficiency* was better at low ratios but *economics* encouraged higher ratios. After the initial capital outlay, the *operating* cost with a lower ratio would be less. This rationale was known as long as Reist had been around; he had been in the field since the 1960's (Tr. 610). Reist also testified that an article co-authored by Frey in 1964 (Defendant's Exhibit 7) taught air-to-cloth ratios at less than eight feet per minute and as low as 2.34 feet per minute for pulse jet cleaning (Tr. 613).

The court finds that prior art taught use of pulse jet cleaning mechanism, use of pleated paper filter cartridges, and variance of air-to-cloth rations/face velocities to achieve the proper working efficiencies for different filter media, different cleaning mechanisms, and different particulates to be filtered. It concludes, therefore, that the combination of the pulse jet cleaning mechanism (from the baghouse filters) with the pleated paper filter cartridge (from the Spriggs/Quik-Change mechanism) and the lower face velocities from the "normal" use of the cartridge in truck applications or of the pulse jet in the baghouses was obvious.

## FAILURE TO DISCLOSE RELEVANT INFORMATION TO THE PATENT OFFICE

The patent application process places upon patent applicants "a duty to disclose

1438

to the [Patent] Office information they are aware of which is material to the examination of the application." 37 C.F.R. § 1.56(a). The patent regulations provide:

No patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or gross negligence. The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C. 131 and 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) *that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.* (Emphasis added.)

37 C.F.R. § 1.56(d). In addition, and most relevant to this case, intentional failure to make the required disclosures may lead to a patent's being found invalid and thus unenforceable.

It is, of course, well established that the exercise of fraud, inequitable conduct, or bad faith in prosecution of a patent application before the Patent Office may result in unenforceability of the patent ultimately issued.... This rule of equity stems from the "paramount interest [of the public] in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct." ... Because the Patent Office lacks proper means for fully investigating patent claims, a patent applicant stands before it in a confidential relationship. The system could not function successfully if an application were "allowed to approach the Patent Office as an arm's length adversary." ... Instead, the applicant owes an "absolute duty of full and complete disclosure of all matters reflecting adversely upon his patent," ... and he risks non-enforcement of his monopoly on later discovery of a failure to fulfill that obligation.

*True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495, 501 (10th Cir.1979).

 Facts which may lead to a holding of fraud in the PTO must be proved by "clear, unequivocal, and convincing evidence." *Othopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983). A finding of both intent to mislead or defraud and materiality of the omitted information is crucial to a conclusion that the patent is invalid. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350 (Fed.Cir.1984).

The definition of materiality provided by the patent office rules is that information "is material where there is [1] a *substantial likelihood* that [2] a *reasonable examiner* [3] would consider it *important* [4] in deciding *whether to allow the application to issue* as a patent." 37 C.F.R. § 1.56(a), emphasis added in citation in *American Hoist & Derrick Co. v. Sowa & Sons, supra* at 1362. However, this standard is flexible.

Questions of "materiality" and "culpability" are often interrelated and intertwined, so that a lesser showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of the withheld information would necessarily create an inference that its nondisclosure was "wrongful."

*Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 716 (1st Cir.1981).

In this case, as set out below, the withheld material was relevant to a showing required by the examiner in order to approve the petition.

Where one who knew, or should have known, that a piece of prior art would be material, i.e., important to the PTO in making its decision, a failure to disclose that art or information can be sufficient proof that a wrongful intent existed to mislead the PTO, and may result in a finding of what has come to be called "fraud" on the PTO. The fact finder, however, must determine not only that the undisclosed art was material, but

that the one charged with non-disclosure knew or should have known of its materiality at the time.

*Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1152 (Fed.Cir.1983). "Proof of the actual state of mind of the applicant or persons associated with or representing the applicant is nor required." *Rohm & Haas Co. v. Crystal Chemical Co.,* 722 F.2d 1556, 1571 (Fed.Cir.1983).

The court has reviewed in detail the documentary and testimonial history of plaintiff's various applications made to the U.S. Patent Office for the Frey invention between the time the first application was made in July, 1974, and the time when the patent was finally issued in August, 1980. During this period, plaintiff filed three separate applications. The first was rejected, the second abandoned and the third, filed as a continuation of the second application, with amendments, was finally approved after amendments were made and additional test results shown to the examiner in October, 1978. (The "file wrapper" with the pertinent documents discussed below is Defendant's Exhibit 24.)

The first application did not use the term "derating" (Tr. 122). In Frey's "record of invention" submitted to Donaldson in May, 1974, no mention of the velocity of cleaning or the concept of "derating" was mentioned. The history and description of the invention focuses on employing the "Duralife filter elements" (the pleated paper truck filters) with a reverse jet cleaning mechanism (Defendant's Exhibit 32).

In October, 1977, the amendments filed with the request for continuation of consideration of the 1975 claim show that claims 1–3 of the original application had been approved previously ("Amendment Before First Action, p. 10") and that those claims were primarily the invention of another engineer, James L. Berkhoel, and focused primarily on the "apparatus for retaining the filter elements in position over the apertures in the partition" (Frey affidavit filed October 31, 1977, p. 2). The newly pressed, and formerly rejected, claims (claims 14–16, renumbered 8–10 by the examiner) were asserted by Frey in the Octo-

ber, 1977, affidavit to be "described in a record of invention executed by me on May 3, 1974" (discussed above). Claims 8–10, described a "dust collector apparatus for cleaning air laden with particulate matter at a predetermined rate, in terms of volume per unit time" and then went on to discuss the parts of the physical apparatus concluding with a

> means for reducing the impact of the particulate matter on said pleated paper so that the particulate matter can be periodically removed during reverse jet cleaning comprising said plurality of filter elements having a total filter area sufficient to reduce the velocity of air flow through each filter element to a velocity substantially lower than said normal rated velocity and at which the filter elements can withstand the stresses placed upon said pleated paper by continuous reverse jet cleaning.

(Amendment Before First Action, p. 9.) These claims were once again rejected by the examiner who concluded that

> L [prior art cited as a Great Britain patent] substantially discloses the claimed device except for the paper filter medium and the impact reducing means. A [prior art cited as a United States patent] teaches the obviousness of using paper as the filtering medium. Both R and S [a 1962 and a 1973 article about filtering] teach the obviousness of using filter elements of encreased effective filter area. *The degree of "derating" is considered to be an obvious matter of choice or design to the skilled artisan.* (Emphasis added.)

(O.A. 6/26/78). In an examiner interview summary record dated October 25, 1978, the examiner reported that the applicant would submit an affidavit with supporting evidence to show that "a derated filter must be used in the pulse jet cleaning system in order for the system to efficiently function and to show that the substitution of the paper filter alone will not operate efficiently." The examiner agreed that if the information was provided, the application would be "favorably dispose[d] of" (Interview record).

In its final amendment and response to the examiner's June 26, 1978, decision, plaintiff submitted amended claims and an argument which stated that while pleated paper filters had been used prior to the present invention, they had been limited to applications where there were used until full and then thrown away. It went on to argue that

> However, if a pleated paper filter element is used in an industrial dust collector cleaned by reverse jets, at its normal rated velocity, the effect is to very quickly destroy the paper filter. At such relatively high velocities, the particulate matter in the air is driven into the paper and becomes imbedded therein, thus decreasing the porosity of the filter.... As the paper filter material becomes more clogged, the high velocity reverse pulses of compressed air can no longer pass quickly through the filter material and *thus act to physically damage the material by the repeated impacts of the air on the inside of the filter element. Because of these physical stresses, the life of the pleated paper filters becomes so short as to be economically unfeasible.*

(Emphasis added, Response 10/23/78, p. 12). Plaintiff went on to argue that the prior art cited by the examiner as teaching the obviousness of derating

> teach only the derating of filters for use in filtering. There has been no teaching of grossly derating a pleated paper filter to enhance cleaning by pulse jets. Applicant's contribution has been the recognition that if the filters are grossly derated, far beyond anything necessary or even useful for the filtering parts of their lives, the pleated paper filters can be used in industrial dust cleaning applications where they must be cleaned by reverse jets of compressed air. This derating is independent of, distinct from, and not related to the derating of a filter element which is not mechanically cleaned, merely to increase the normal filtering life.

(Id. at 14.) In support of its arguments (essentially repeated in documents filed November 16, 1978, "Remarks"), plaintiff submitted test results which purported to show that "it was not substantially possible to adequately clean the filters by pulse jets without substantially derating the filter elements" (Unsigned affidavit by Robert Frey, dated November 15, 1978).

One of the test results (from the Northern Malleable Iron Company), attached to Frey's affidavit, concluded that the tests run at higher velocities (35 mm/sec and 25 mm/sec) were unsuccessful; in the first test it was said that the pressure drop did not stabilize and in the second that it did not stabilize "and again a media failure occurred between 408.6 hours and 539.6 hours." When run at 12 mm/sec, the unit ran for 443.2 hours without failure and the pressure drop was stabilized.

This summary represented three pages out of a 181-page report (Defendant's Exhibit 46) which presented the results of other field tests showing that the filter *could* be cleaned at velocities of up to 7 to 8 fpm without failure. The tests at the Cornelius Company were all run at 35 mm/sec velocity air flow and the "filter media maintained its integrity throughout the test" (Id. at 122). The test results state that *a* media failure did occur at the other test site (Northern Malleable) but that "It is felt, however, than a stronger substrate media will solve this durability problem" (Id. at 104). The destruction was attributed to the heavier dust loading during that test, *not* to the cleaning pulses themselves (Id. at 127). Indeed, one of the conclusions of the report was that collection efficiency is a function of air-to-cloth ratio but that "fine fiber media can run at air-to-cloth ratio of 8 to 1 at the same efficiency as standard media, at a 2 to 1 air-to-cloth ratio. Cleaning pulse pressure had no effect on collection efficiency" (Id. at 4). *See, also,* Defendant's Exhibit 106.

Finally, it is apparent from the report that the tests were directed primarily at testing an experimental filter material—nonwoven double mat filters—and not at determining the necessity of "derating" for either efficiency or preventing destruction of the filter media (Id. at 2).

The results of other testing, attached to the Lissick affidavit, show that when the test was conducted at what was called "rated velocity" (here 8 fpm), it had to be terminated in less than five minutes "because the filters did not clean properly and the fan was unable to maintain the proper air flow through the unit." When the air was fed through at what was termed a "derated velocity," meaning simply reduced to 2 fpm, the unit was said to have stabilized and the test ended (Lissick Affidavit, p. 3).

The prior art attached to the amendments includes no mention of the Spriggs patent or the Quik-Change device discussed extensively, above, as relevant prior art showing the obviousness of plaintiff's alleged invention.

After submission of the further arguments, affidavits and test results in November, 1978, the patent application was finally allowed. The examiner stated,

> The primary reason for allowance of the claims is the inclusion in all of the claims of using grossly derated pleated paper filter elements in conjunction with pulse jet cleaning of the elements so that the elements can withstand the stressed placed upon them by pulse jet cleaning. Applicant's fourth affidavit, in exhibit B shows unexpected results from this combination. (Emphasis added.)

(Attachment to paper no. 15, "Official Communication) In allowing the claim, the examiner required that the phrase "and said pleated paper filter medium can withstand the stresses placed upon it by the reverse jet cleaning" be added to each of the heretofore rejected claims (Paper no. 16, "Examiner's Amendment").

The court finds that the failure of plaintiff to reveal formally the prior art represented by the Spriggs patent and its commercial embodiment, the Quik-Change device, the revealing of only three pages of a 181-page test report; and the misconstrual of the results of those tests in the accompanying affidavits constituted material misrepresentations of issues critical to the examiner's subsequent approval of the patent. The examiner specifically found that the reason the claims were allowed was that he felt that plaintiff had shown that the process had to be "grossly derated" when cleaned by the pulse jet *so that the elements can withstand the stress placed upon them by pulse jet cleaning* " (emphasis added). This is a finding simply not tenable when the information that plaintiff failed to present to the examiner is examined. The 181-page report, from which only three pages were included in the report to the examiner, explicitly finds that the destruction of the media is attributable not to the type of cleaning but to the level at which the dust is loaded onto the media. As discussed in the section on obviousness, above, the testimony showed that the reverse jet cleaning used in the Spriggs device could be just as harsh on the paper media as the pulse jet, showing therefore that it was not the use of the pulse jet with the paper that necessitated derating to save the material from destruction.

 When, as in this case, affidavits are submitted with the purpose of overcoming objections and prior-art rejections entered by the examiner, and the rejections are thereafter withdrawn in response to the affidavits, it is clear that the affidavits and misrepresentations made therein affecting the examiner's decision are material. "In contrast to cases where allegations of fraud are based on the withholding of prior art, there is no room to argue that submission of false affidavits is not material." *Rohm & Haas Co. v. Crystal Chemical Co., supra,* 722 F.2d at 1571.

The court finds that plaintiff knew or should have known that the prior art contained in the Spriggs patent and the Quik-Change device and the other tests not included with the affidavits were material to the examiner's decision. The court thus concludes that plaintiff wrongfully intended to mislead the patent office and made wilful misrepresentations constituting fraud.

 The court concludes that plaintiff's failure to reveal the rest of the test reports and the prior art represented by the

Spriggs patent were material misrepresentations to the patent office and are a second basis upon which the patent is invalid and unenforceable.

In a brief memorandum of decision issued after the trial, the court indicated that "if the patent is valid, it is infringed by the defendant's product."

After a fuller study, the court has concluded that the defendant's product would not infringe the plaintiff's patent if the patent were valid, because the evidence clearly shows and the court now finds as a fact that defendant had begun and had essentially completed the development of the pulse jet cartridge system prior to the issuance of plaintiff's Frey patent in August of 1980.

Ugo Bert, defendant's vice-president for specialty air products, testified, and the court finds, that defendant began working to develop its pulse jet cartridge system in 1978 in an attempt to capture the Middle East gas turbine market (Tr. 372–373). By April, 1978, defendant had already developed plans for such a system with specifications by Aramco, a Saudi Arabian corporation (Defendant's Exhibit 103).

Harry Barr, defendant's vice-president for research and development, testified, and the court finds, that he became involved in the development of the pulse jet cartridge system in 1979 (Tr. 551) and that development work was essentially complete by the time he learned of plaintiff's *Canadian* patent on the Frey invention in early 1980. Defendant has spent more than $180,000 in developing its pulse jet cartridge system (Tr. 553). When Barr learned of the issuance of plaintiff's United States patent in August, 1980, he immediately contacted defendant's patent attorney who reviewed the patent with the company's engineers and officers and advised them that the patent was not valid and that defendant was not infringing it (Tr. 555).

In April, 1979, defendant had provided Wix Corporation a Donaldson cartridge, or at least the filter media, for analysis of the media. Wix was to design the paper cartridge for defendant's filter (Tr. 394). The reports from Wix (Plaintiff's Exhibit 54) stated that the element and gasket specs are "exact" on both the Donaldson and the Pneumafil cartridges. Defendant's project engineer, Lewis Levie, one of the persons responsible for the development of the pulse jet cartridge collector, testified that the term "exact" meant that the specifications were "accurate" and not that they were "equal" (Tr. 397). The court finds this testimony to be credible and his explanation the logical interpretation of the term as used.

The evidence shows that defendant's engineers examined plaintiff's cartridge system and attempted to equal or better its performance (Tr. 404, Plaintiff's Exhibits 47 and 48). This does not mean, however, that defendant infringed plaintiff's patent, if it were valid. The court credits defendant's witnesses' testimony that defendant had begun its development of the pulse jet cartridge system independently and in response to the growing Middle East market and that its development was parallel to and not based on a copying of plaintiff's development of its pulse jet cartridge system. The court finds further that the essential aspects of defendant's system were developed well before the issuance of plaintiff's patent and that defendant did not violate that patent by production of the already-developed product after issuance of the patent.

The court concludes, therefore, that even were plaintiff's patent valid, defendant has not infringed that patent.