The PROCTER & GAMBLE COMPANY, Plaintiff,

v.

KIMBERLY–CLARK CORPORATION, Defendant.

Civ. A. No. 2:87–0047–1.

United States District Court, D. South Carolina, Charleston Division.

July 20, 1989.

Richard S. Rosen, Morris D. Rosen, Rosen, Rosen & Hagood, Charleston, S.C., Allen H. Gerstein, Kevin Hogg, Carl E. Moore, Jr., Douglass C. Hochstetler, Terry W. McMillan, Anthony Nimmo, Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., Richard C. Witte, Fredrick H. Braun, The Procter & Gamble Co., Cincinnati, Ohio, for plaintiff.

Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, S.C., V. Bryan Medlock, Jr., Roy H. Hardin, Richards, Harris, Medlock & Andrews, Dallas, Tex., William O. Fifield, William Baumgartner, Blair White, John M. George, Sidley & Austin, Chicago, Ill., O. George Everbach, Gen. Counsel, Kimberly–Clark Corp., Dallas, Tex., for defendant.

## ORDER

HAWKINS, Chief Judge.

Prior to November 1982, the two major players in the disposable diaper market, the Procter & Gamble Company (P & G) and Kimberly–Clark Corporation (K–C), told the consuming public that a thicker disposable diaper was a better, more absorbent disposable diaper. In November 1982, two inventors at P & G set in motion a chain of events which would radically alter the message which was sent to the public by these two companies.

Shortly after Paul Weisman and Steve Goldman allegedly found the secret to the effective inclusion of superabsorbent materials in wood pulp fluff, P & G and then K–C sent a new message to the consumers. The new message was that a thinner disposable diaper is equally or more absorbent than a thick diaper, and it is better fitting. Today, disposable diaper sales exceed $3 billion annually, and P & G and K–C con-

trol approximately 80% of this market. Thin disposable diapers, including P & G's Luvs Deluxe for Boys, Luvs Deluxe for Girls, and Ultra Pampers Plus, and K–C's Huggies Supertrim diapers, now constitute the lion's share of that 80% of the market shared by P & G and K–C.

Although the consumers seem delighted with the thinner diapers, all is not calm on the disposable diaper front. This lack of calm stems from P & G's accusations that K–C copied the invention of Weisman and Goldman and thereby infringed a patent obtained by P & G on the inclusion of superabsorbent materials in wood pulp fluff for use in disposable diapers and other disposable absorbent products. These accusations form the basis of this action which P & G filed in January of 1987.

This case was tried before the court sitting without a jury beginning on April 10, 1989, and concluding with closing arguments on May 31, 1989. The court endured seventeen days of testimony, admitted nearly one thousand exhibits and accepted volumes of deposition testimony.

Although the record is voluminous, the issues to be decided by this court are relatively few. P & G alleges that K–C's Huggies Supertrim diapers infringe United States Patent No. 4,610,678 (hereinafter "the Weisman patent") issued to P & G on September 9, 1986 and that such infringement is the result of K–C's having intentionally copied P & G's product. K–C, of course, disputes the infringement allegations and counters that the patent is invalid because 1) the alleged invention is anticipated by prior art, 2) the alleged invention is obvious in light of prior art, and/or 3) P & G committed inequitable conduct before the United States Patent and Trademark Office (herein "USPTO" or "PTO").[1]

K–C's answer to P & G's complaint included a counterclaim for a declaratory judgment that the patent is invalid, not infringed and unenforceable and asserted numerous antitrust counterclaims against P & G. By order of January 4, 1988, United States Magistrate Robert S. Carr, to whom the case had been assigned for resolution of pre-trial matters, stayed the antitrust counterclaims pending resolution of the patent claims.

Having heard and observed the evidence presented at trial and having considered each party's proposed findings of fact and conclusions of law and the closing arguments of the parties, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I. Jurisdiction and Venue

1. Plaintiff, The Procter & Gamble Company, is an Ohio Corporation having its principal place of business in Cincinnati, Ohio.

2. Defendant, Kimberly–Clark Corporation, is a Delaware Corporation having a regular and established place of business at Beech Island, South Carolina, which is located in this District and Division.

3. Jurisdiction and venue are provided for by Title 28, United States Code, Sections 1338(a) and 1400(b), respectively.

II. Background Facts

  A. *The parties and the disposable diaper market*

4. P & G and K–C are large companies engaged primarily in the manufacture and sale of consumer goods. For years, these two companies have been the principal competitors in the disposable diaper industry. P & G manufactures Luvs and Pampers brand diapers, and K–C manufactures Huggies.

5. Competition in the disposable diaper industry and specifically between these two parties is keen and includes aggressive research intended to facilitate improvements

---

1. A finding of inequitable conduct renders a patent unenforceable for the life of the patent. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1561 (Fed.Cir.1984). A finding of unenforceability is broader than a finding of invalidity with respect to certain claims in issue. The unenforceability finding renders all of the claims of the patent unenforceable whereas a finding of invalidity only affects the claims at issue in the particular action. *Id.* at 1561–1562.

in the design and performance of the respective diapers. In 1988, for example, P & G invested $652 million in research and development throughout its company. The diaper research of P & G and K–C has led fairly recently to elastic waist bands, elastic leg bands, refastenable tapes and an hourglass-shaped diaper. These product improvements are critically important to the relative success of the different brands of disposable diapers.

### B. *History of the Weisman/Goldman invention*

6. In the early 1980's, P & G was concerned about the decrease in market share of its flagship brand, Pampers. In order to combat this decline, P & G began its search for a discontinuity in diaper design—an improvement which would revolutionize the diaper industry and resuscitate its flagship brand.

7. At that time, the absorbent core of the Pampers disposable diaper was made of wood pulp fluff (also referred to as "Foley fluff"). Generally, the absorbent capacity of a disposable diaper is related to the size and number of voids created in the fluff pad or core. The "thicker is better" theme, which was espoused by P & G and K–C prior to the introduction of thin diapers, was a convenient way of expressing a complex physical phenomenon. In order to maintain void volume, manufacturers of thick diapers were careful not to compress or "densify" the fluff of the core beyond what was necessary to keep the core from falling apart. Typically, the density of thick, fluff-only diaper cores was 0.10 $g/cm^3$ or less. At such a density, the fluff had sufficient integrity to hold together, but was not so dense as to decrease the void volume and reduce the diaper's urine holding capacity.

8. In the early 1980's, the improvements in diaper absorbency generally resulted from addition of more wood pulp fluff to the absorbent core in order to increase the capacity of the diaper. This "improvement" also had an unwieldy side effect. More specifically, adding fluff to diaper cores resulted in more absorbent diapers but also resulted in a diaper which was aesthetically displeasing, which was bulky and hard for mothers and fathers to carry in large quantities, and which took up a great deal of shelf space in the retail outlets.

9. In order to remedy Pampers' decline in market share, P & G placed Harry Tecklenberg on special assignment. He reported to the chief executive officer of P & G and had the singular task of overseeing the development of a technological breakthrough in the disposable diaper arena.

10. At this same time, P & G assembled a team of scientists, some of whom were very experienced in the paper products field and some, like Goldman and Weisman, who were less experienced. The goal of this product development team was to find the breakthrough which P & G felt was needed for resurgence of Pampers.

11. Although P & G and others in the field had been aware of the existence of superabsorbent materials, none of these materials had been successfully incorporated into the absorbent core of a commercially successful diaper in 1982. It was generally agreed that a superabsorber/fluff absorbent core did not work well because of a phenomenon known as gel blocking.

12. Superabsorbers are manufactured in many forms including particulate and fibrous. Most superabsorbers are polymers or long chains of cells or "mers." When placed in solution, sodium floats off leaving negative charges along the backbone of the chain. These negative charges repel each other and cause the chain to expand. Furthermore, these negative charges attract the hydrogen atoms in the water molecule and thereby "organize" and "stiffen" the water. Other molecular chains hold the polymer chains together to keep them from "sliding apart" and becoming a slush in solution. The degree of "cross-linking" of the polymer chain effects both the strength and the absorptive capacity of the polymer. Greater cross-linkage results in less absorptive capacity but greater strength. Some superabsorbers, such as Sanwet IM–1000, a cross-linked polymer produced by Sanyo Chemi-

cal Industries, can absorb as much as 1000 times their weight in deionized water. [O'Connor 17: 61–63, DX 28 [2]]

13. As mentioned previously, one problem which prevented widespread use of superabsorbers in diapers was the phenomenon of gel blocking. This phenomenon occurs when two or more particles of superabsorbent material swell together and form a dam which prevents or inhibits water or other fluid from passing through the superabsorber "dam" into the remainder of the absorbent structure. In a fluff/superabsorber structure, gel blocking prevents fluid from permeating the entire structure. For this reason, the actual absorptive capacity of the fluff/superabsorber structure is less than its theoretical capacity which is equal to the sum of the capacities of each component of the absorbent structure. In a 1979 study on "Absorbency of Fluff/Superabsorbent Composites," K–C scientist Fred Lassen found:

> [T]he total effect of the individual absorptive interactions of the fluff (an absorbent which absorbs primarily by capillary attraction) and the superabsorbent (a material which absorbs by the physiochemical process of gel forming) is neither synergistic or additive but is, in fact, mutually detrimental, i.e. "antisynergistic."

[PX 140, p. 15]

14. In 1982, Paul Weisman and Steve Goldman were both employed within the absorbent structures section of the paper products division of P & G. Goldman worked primarily with CAM, an acronym for citrus absorbent material, which was a sponge-like substance made from the peels of citrus fruits. He also worked with CLD or cross-linked derivative of carboxymethyl cellulose and with superabsorbers, which he classified as any material which could absorb greater than twenty times its weight in liquid.

15. The CAM with which Goldman worked contained a natural superabsorber, pectin, in the walls of the sponge structure. Goldman stated that the purpose of his working with superabsorbers was really to try and improve the performance of the CAM and the natural superabsorber contained therein. During this period, however, he discovered 1) CAM did not gel block, and 2) absorbed water could not be squeezed from the capillaries between the superabsorbent material and the CAM structure. Goldman further found that the absorptive capacity and rate of the CAM was not significantly affected by pressures of up to one pound per square inch.[3] He determined that the CAM maintained voids and capillaries under pressure which permitted the CAM to also maintain its absorptive capacity.

16. In October of 1982, a group of people from P & G's Miami Valley Laboratories met at the Buckeye Cellulose Division of P & G in Memphis, Tennessee. Trevor Walker asked Goldman to speak at the meeting, and Goldman chose to discuss his discoveries with respect to CAM. Paul Weisman attended Goldman's presentation which took place on October 1, 1982. At this meeting, Goldman related what he learned from his CAM experimentation— that in order to avoid gel blocking it was necessary to maintain voids and capillaries between swollen particles. Maintaining the voids and capillaries permitted water to permeate the absorbent structure.

17. Goldman suggested two possible ways to solve the gel blocking problem. First, he opined that a stiffer superabsorber might require higher pressures or loads before gel blocking, and he subsequently obtained a patent on superabsorbers with superior stiffness characteristics. Second, he suggested introduction of other components which would maintain capillarity under pressure. Goldman did not find any method for accomplishing this second theoretical solution to the gel blocking problem.

---

**2.** This exhibit was admitted subject to further proof as to its date. Such proof was never furnished, but the court refers to the exhibit only for its description of the qualities of Sanwet IM 1000 and has not considered whether this exhibit is prior art to the Weisman invention.

**3.** One pound per square inch is the approximate pressure placed on a diaper by a baby.

18. After viewing Goldman's presentation, Weisman and his lab technician, Eddie Hartwell, tested densified structures of wood pulp fluff and superabsorbent material. Weisman theorized that densification would provide for greater wicking or suction throughout the absorbent core and that a densified structure might maintain capillarity under load. Weisman and Hartwell initially conducted partition testing of the densified structure. The results of these tests were promising, and they prompted P & G to conduct a leakage study using the densified superabsorber/fluff structure.

19. A leakage study is a usage test of an absorbent structure which has been incorporated into a diaper. The babies who participate in the study wear the experimental products over a period of time, and the product's performance is evaluated by weighing the diaper after it first begins to leak to determine the amount of fluid which has been absorbed. Laboratory tests are not always accurate predictors of whether a particular structure will perform well in actual use. The leakage study, on the other hand, does, as a general rule, accurately predict performance characteristics of a particular diaper.

20. On November 10, 1982, Weisman, Hartwell, and Tom DesMarais, a colleague of Weisman, conducted a leakage study which compared a Luvs thick diaper with two prototype diapers containing a fluff/superabsorber core densified to .3 $g/cm^3$. The all fluff Luvs diaper weighed 46 grams and, based on its void volume, had a theoretical capacity of about 12 grams per gram. The two prototype diapers weighed 31½ and 30 grams respectively, and had theoretical capacities of only 2.6 g/g.

21. The results of the leakage study were in direct contradiction to the theoretical capacities of the diapers. The Luvs diaper absorbed an average of 151 grams of fluid while the prototype diapers absorbed an average of 192 grams and 191 grams respectively. Thus, the prototype diapers, which weighed about 15 grams less than the Luvs diaper, absorbed considerably more fluid prior to leaking than did the Luvs diaper. This theoretically unexpected capacity resulted from the ability of the superabsorber to swell and thus for the entire absorbent structure to swell. In other words, the densified structure swelled to provide "capacity on demand." In fact, the prototype diapers tested in the November 1982 leakage study increased in caliper by 250%.

22. P & G contends that Weisman's genius stroke was his discovery that a superabsorber/fluff mixture performs better if the entire structure is densified. In the words of P & G attorney Allen Gerstein, Esq.:

> [Weisman] came up with an ingenious idea of going completely contrary to what K–C had been thinking, to what Procter & Gamble had been thinking, to what the literature had been saying. And he decided to densify it. To do exactly the opposite of what was happening. He theorized if you took this fluff and squeezed it down you would pre-collapse your structure, so that you had these capillaries fixed and after they were wetted, they would allow fluid to get to the superabsorbers and the entire structure would swell.

[Opening argument 1: 13]

23. Steve Goldman succinctly described the gist of the Weisman/Goldman invention during his testimony. He stated that a structure with a density of about .15 $g/cm^3$ does not significantly collapse under baby pressure even if the structure is wet. Contrarily, he pointed out a structure densified to .125 $g/cm^3$ will collapse to about .15 $g/cm^3$ when wetted and placed under baby pressure. Because a structure with a density of .15 $g/cm^3$ does not collapse under load, it avoids gel blocking for precisely the reason that Weisman and Goldman theorized—it maintains capillarity when wetted and placed under load. In the words of Goldman:

> So by precollapsing the structure to the density of .15, we've insured that the—these capillary pathways, these densified fiber networks that we put between gel particles stay in place, the

structure is relatively stable under the conditions of use, fluid and baby pressure. [Goldman 4: 421–422]

24. Armed with the results of the leakage study, P & G began taking steps which would lead to the commercialization of a thin diaper which incorporated superabsorbers. P & G first introduced new thin Pampers in a test market in the Wichita, Kansas area. The test market proved successful and, in fact, P & G's share of the market increased ten percentage points in about nine months. P & G ultimately obtained a fifty percent share of the Wichita market after P & G saw the share decline to twenty-five percent prior to the introduction of thin diapers. [Andre 2: 95–96, 101–102, 106; PX 274]

25. The success of the Kansas test market then prompted P & G to roll out the thin Pampers nationally beginning with a lead market in Cincinnati, Ohio on October 21, 1985. The lead market results confirmed the test market findings and prompted the continuing national roll out of thin Pampers throughout the first part of 1986. [Doornink 8: 903–908; DX 816; DX 839]

III. The Weisman patent and the claims which form the basis of this action

A. *The history of the Weisman patent*

26. Defendant's exhibit 162 is a certified copy of the file wrapper for the application which resulted in the Weisman patent. George Allen, an attorney in P & G's patent department, was primarily responsible for the prosecution of the Weisman patent application. Allen succeeded Jacobus Rasser in P & G's patent department in December 1984, and he inherited most of Rasser's cases. The Weisman patent application was one of those cases. Sherri E. Vinyard was the examiner with whom Allen dealt in the PTO.

27. P & G filed the original (grandparent) application for the Weisman patent; application Serial No. 473,846, on March 10, 1983.

28. The broadest claim of the application, Claim 1, contained the following language:

A flexible, substantially unbonded, absorbent structure comprising a mixture of hydrophilic fibers and discrete particles of a water-insoluble hydrogel [4], in a fiber/hydrogel weight ratio of from about 30:70 to about 98:2; said absorbent structure having a density of from about 0.15 to about 1 g/cm$^3$.

(Footnote not in original).

29. None of the claims of the application contained any language specifying moisture content of the absorbent structure. Before the PTO substantively examined the grandparent application, P & G abandoned it. [Bailey 14: 10; DX 161 at pp. 27–30 of the application]

30. On June 24, 1983, before abandonment of the grandparent application, P & G filed a continuation-in-part application relating to the Weisman invention (the parent application). The parent application was virtually identical to the grandparent. Claim 1 of the parent application, Serial No. 507,824, was identical to Claim 1 of the grandparent application, and none of the claims of the parent application specified moisture content. [Bailey 14: 10–11; DX 160 at pp. 29–33 of the application]

31. The PTO rejected all of the claims in the parent application on November 20, 1984. The Examiner concluded that the claims were unpatentable because the subject matter was obvious in view of U.S. Patent 4,340,556 issued to a Johnson & Johnson employee, Ciencewicki. Ciencewicki's invention involved airlaying of hydrogel onto a carded web batt which was not airlaid. The batt was then densified to a density of "from about 0.2 to 1.2 gm/cc." (DX 7, col. 6, lines 30–31). On December 14, 1984, following the rejection, Allen traveled to Washington and met with the Examiner. At that meeting, Allen showed the Examiner products made pursuant to the

4. "Hydrogel" is another name for superabsorbent material. Throughout the trial, superabsorbent material was referred to as any of the following: hydrogel, SAM (superabsorbent material), and SAP (superabsorbent polymer).

Ciencewicki patent and products made pursuant to the claimed invention. He told the Examiner there were differences between the two. These differences apparently had to do with the way the superabsorbent particles were dispersed in the claimed absorbent structure. Allen told the Examiner that the differences would either be added to the claims or shown by comparative testing. [Bailey 14: 11–13; DX 160, Examiner's Interview Summary Record of December 14, 1984; DX 7]

32. P & G abandoned the parent application on February 19, 1985 before effecting any of the changes which Allen had previously discussed with the Examiner. [Bailey 14: 13–14; DX 160]

33. Before abandoning the second application, P & G filed a continuation-in-part application, Serial No. 529,900, (the child application) on September 6, 1983. In this application, Claim 1 contained a requirement that the absorbent structure have "a moisture content of less than about 10% by weight of the dry absorbent structure." The grandparent and parent applications did not contain this moisture content requirement. [Bailey 14: 14–16; DX 162 at p. 31]

34. On or about January 16, 1985, the Examiner rejected all of the claims of the application and cited the Ciencewicki patent. [Bailey 14: 16; DX 162 at pp. 40–41]

35. Allen again traveled to Washington and met with the Examiner on March 8, 1985. Allen proposed adding a new requirement to Claim 1 of the patent application. This new requirement would prescribe the airlaying of hydrogel *and* the airlaying of hydrophilic fiber, thus avoiding the Ciencewicki patent, which did not involve airlaying of hydrophilic fiber. On April 17, 1985, P & G amended Claim 1 to include the "air-laid" limitation. [Bailey 14: 16–20; DX 7; DX 162 at pp. 42, 165]

36. After the April 17, 1985 amendment, Claim 1 of the patent application covered:

A flexible, substantially unbonded, absorbent structure comprising an air-laid mixture of hydrophilic fibers and discrete particles of a water-insoluble hydrogel, in a fiber/hydrogel weight ratio from about 30:70 to about 98:2; said absorbent structure having a density of from about 0.15 to about 1 g/cm³ and a moisture content of less than about 10% by weight of the dry absorbent structure. (DX 162, p. 165)

[Bailey 14: 19–20; DX 162 at p. 165]

37. On July 15, 1985, the Examiner rejected Claims 1–7, 10 and 11 as being obvious. The Examiner based this obviousness rejection not on Ciencewicki, but on a newly applied patent, U.S. Patent No. 4,252,761 to two P & G employees, Schoggen and Smith. She rejected Claims 8, 9, 12, 19, 21, 22 and 24–28 as being obvious in view of the Schoggen patent and another prior art patent, U.S. Patent No. 3,661,154 to Torr. Finally, the Examiner rejected the remaining seven claims, Claims 13–18, 20 and 23, as being anticipated by the Schoggen patent. Accordingly, as of July 15, 1985, all of the claims in the application stood rejected. [Bailey 14: 20–23; DX 162 at pp. 173–175]

38. In her rejection notice, the Examiner acknowledged that the Schoggen patent and the Torr patent differed somewhat from the Weisman invention because both Schoggen and Torr required the use of more than 10 percent moisture at the time of densification. However, the Examiner concluded:

Since the moisture will evaporate after manufacture and is a function of the humidity of the environment, it appears to be a noncritical parameter of the product.

(DX 162 at p. 175). With respect to Claims 8, 9, 12, 19, 21, 22 and 24–28, she further noted, "Applicant argues that Schoggen produces a bonded structure. There is nothing in Schoggen or in the Applicant's claims that distinguishes one from the other." (DX 162 at p. 175) [Allen 28: 20; Bailey 14: 23–25; DX 162 at p. 175]

39. After receiving the July 15, 1985 rejection, Allen again traveled to Washington and met with the Examiner on August 14, 1985. During the meeting, Allen argued the following to the Examiner:

Unlike Schoggen et al, the present invention relates to the preparation of webs from air laid mixtures of fibers and hydrogel particles wherein said mixtures are *substantially dry*, i.e. contain less than 10% by weight moisture. Upon densification, these dry mixtures yield webs which are *substantially unbonded*. The substantially unbonded nature of the fibers in such webs manifests itself in the relatively lower Gurley Stiffness values of the webs of the present invention in comparison with densified webs formed from moistened fibers.

(DX 162, p. 177) (emphasis in original). The Examiner told Allen to provide data supporting this assertion. In the written record of the interview, the Examiner noted:

Schoggen will be distinguished over by comparative data with that of the present application with respect to Gurley Stiffness. Data applicable to Schoggen will be applicable to Torr '154 since it also requires moistening of the structure.[5]

(DX 162 at p. 176) [Bailey 14: 26–27; DX 162 at p. 176]

40. Allen also presented the Examiner with "proposed" claim amendments which would amend Claims 1, 12, 13, and 22 to add a further requirement that the absorbent structure have a Gurley Stiffness value of less than 2 grams. [Bailey 14: 30–31; DX 162 at p. 178]

41. However, when Allen sent the formal amendment of the claims to the PTO on November 18, 1985, Claims 1 and 13 did not incorporate the Gurley Stiffness limitation earlier proposed. Allen did add the Gurley Stiffness limitation to Claims 12 and 22. Claim 1 now covered:

A flexible, substantially unbonded, absorbent structure comprising an air-laid, substantially dry mixture of hydrophilic fibers and discrete particles of a water-insoluble, cross-linked polymeric hydrogel, in a fiber/hydrogel weight ratio from about 20:70 [sic] to about 98:2; said absorbent structure having a density of from about 0.15 to about 1 g/cm³ and a moisture content of less than about 10% by weight of the dry absorbent structure.

(DX 162 at p. 184) [Bailey 14: 31–32; DX 162 at p. 184]

42. Allen explained the absence of the Gurley Stiffness limitation from Claims 1 and 13 in the following remarks, submitted with the November 18 amendment:

At the interview Applicants' attorney also proposed claim amendments substantially similar, but not identical to, the claim amendments presented herein. In particular, the amended claims presented herein do not include specific Gurley Stiffness values recited in the two broadest article and process claims, even though, as hereinafter discussed, Applicants have demonstrated that the absorbent structures of their invention do, in fact, differ in Gurley Stiffness from the structures of the applied references. Even without reciting Gurley Stiffness values, Applicants' absorbent structures as described in these claims are now clearly distinguished from the applied prior art since these claims characterize such structures as flexible and substantially unbonded and since these claims have been rewritten to indicate that the claimed structures are prepared from "substantially dry" fiber/hydrogel mixtures. It is submitted, therefore, that recitation of Gurley Stiffness values in the broad claims would be redundant and would unnecessarily complicate a potential infringer's ability to ascertain the scope of Applicants' claimed invention.

(DX 162 at p. 188). [Bailey 14: 32–34; DX 162 at p. 188]

43. Along with the November 18, 1985 amendments, Allen supplied the "data" to which the Examiner referred in her interview notes in the form of a declaration filed pursuant to 37 C.F.R. § 1.132 and signed

---

5. Stiffness can be measured with an instrument called the Gurley Stiffness tester. Results are expressed in grams. The Gurley Stiffness value is directly proportional to the stiffness of a product.

by Leonard Thompson.[6] Thompson succeeded Weisman in the disposable absorbent products division of P & G. [Bailey 14: 40; DX 1; DX 162 at pp. 191–194]

44. Table I of the Thompson Declaration compared the Gurley Stiffness values of Schoggen samples with the Gurley Stiffness values of samples prepared using the Weisman invention. Eddie Hartwell, who was now Thompson's technician, tested Schoggen samples which had moisture contents at the time of compression of between 20 and 29.5 percent. Although these samples were moist when densified, Hartwell dried the samples prior to testing their Gurley stiffness. The Schoggen patent did not teach the drying step. Hartwell also tested samples prepared using the Weisman invention which had moisture contents at the time of compression of between 5.8 and 9.5 percent. [Bailey 14: 43–45; DX 1]

45. All of the "moist" Schoggen samples had Gurley Stiffness values greater than 2 grams after they were dried to a moisture content of less than 10 percent by weight. Specifically, the four "Schoggen et al." samples had Gurley Stiffness values of 3.01, 4.98, 4.08 and 5.88 grams, respectively. The "dry" samples prepared using the Weisman invention, by contrast, had Gurley Stiffness values of less than 2 grams. Specifically, the three samples prepared using the Weisman invention had Gurley Stiffness values of 0.86, 0.86 and 0.60 grams, respectively. [DX 1]

46. All of the "moist" Schoggen samples consisted of mixtures of fluff and the hydrogel NaCMC, also known by the abbreviation "CLD."[7] Two of the three "dry" samples prepared using the Weisman invention contained fluff and CLD. The third "dry" sample contained fluff and the hydrogel Sanwet IM–1000. Hartwell did not test any moisturized samples containing fluff and Sanwet IM–1000. [Bailey 14: 44, 46; DX 1]

47. Below the table of Gurley Stiffness data, the text of the Thompson Declaration continued:

> [T]he Table I data show that web structures prepared by densifying air-laid hydrogel/fiber mixtures which have been moisturized are relatively stiff and inflexible as indicated by their Gurley Stiffness values which in general are significantly above 2.0 grams.

[DX 1]

48. On February 19, 1986, the Examiner again rejected most of the claims in the application, citing the Schoggen patent, the Torr patent, and U.S. Patent 3,670,731 to a Johnson & Johnson employee, Harmon. This time, the Examiner made the action "final." However, the Examiner did allow two narrow claims (Claims 12 and 22) to which P & G had added the Gurley Stiffness limitation in the November 18, 1985 amendment. [Bailey 14: 53–54; DX 18; DX 162 at pp. 198–200]

49. Allen again traveled to Washington and met with the Examiner on April 10, 1986. This time, Allen told the Examiner that Claims 1 and 13 would be amended to add the Gurley Stiffness limitation. By amending these two claims, the Gurley Stiffness limitation would be incorporated by reference into all the other pending claims. The Examiner said she would allow the claims with this amendment. Her record of the interview states, "Applicant's proposed addition of Gurley Stiffness values in claims 1 and 13 will bring these claims into condition for allowance." (DX 162 at p. 201) [Bailey 14: 54–55; DX 162 at p. 201]

50. On April 10, 1986, Allen did in fact submit P & G's amendment to Claims 1 and 13, adding the Gurley Stiffness limitation. On May 1, 1986, the PTO allowed all of the remaining claims in the Weisman patent application. On September 9, 1986, the patent in suit, United States Patent No. 4,610,-678, issued to P & G as assignees of the

---

6. The Thompson declaration, Defendant's Exhibit 1, forms the crux of K–C's inequitable conduct defense. This defense will be discussed in greater detail below.

7. "CLD" stands for cross-linked derivative.

inventors, Weisman and Goldman. [Bailey 14: 55; DX 1; DX 162 at p. 209]

B. *The claims of the Weisman patent which form the basis of this action*

51. P & G bases this action on six of the claims disclosed in the Weisman patent. Those six claims include Claims 1, 11, 21, 24, 27, and 30.

### 1. Claim 1

52. Claim 1 of the Weisman patent reads as follows:

A flexible, substantially unbonded, absorbent structure comprising an air-laid, substantially dry mixture of hydrophilic fibers and discrete particles of a water-insoluble, cross-linked polymeric hydrogel, in a fiber/hydrogel weight ratio from about 30:70 to about 98:2; said absorbent structure having a density of from about 0.15 to about 1 $g/cm^3$, a moisture content of less than about 10% by weight of the dry absorbent structure and a Gurley Stiffness value of less than 2 grams.

53. The requirement of Claim 1 that the absorbent structure have a density of at least "about 0.15 $g/cm^3$" is incorporated either expressly or by reference in each of the other claims of the Weisman patent.

### 2. Claim 11

54. Claim 11 reads as follows:

A flexible, substantially unbonded, absorbent structure comprising an air-laid, substantially dry mixture of wood pulp fibers and discrete particles of a water-insoluble, cross-linked polymeric hydrogel in a fiber/hydrogel weight ratio of from about 75:25 to about 90:10, said cross-linked polymeric hydrogel being selected from the group consisting of hydrolyzed acrylonitrile grafted starch, acrylic acid grafted starch, polyacrylate, co-polymers of isobutylene and maleic anhydride, and mixtures thereof, said particles having an average particle size of from about 50 microns to about 1 mm; said structure having a density of from about 0.15 to about 0.6 $g/cm^3$ and a Gurley Stiffness value of less than 2 grams.

55. Claim 11 differs from Claim 1 in the following four respects:

a) Claim 1 requires the presence of hydrophilic fibers, while Claim 11 specifies wood pulp fibers;

b) Claim 1 sets forth a density range of from about 0.15 to about 1 g/cc, while Claim 11 narrows the density range to from about 0.15 to about 0.6 g/cc;

c) Claim 1 sets forth a range for the fiber/hydrogel ratio of from about 30:70 to about 98:2, while Claim 11 narrows this range to from about 75:25 to about 90:10; and

d) Claim 1 requires the presence of discrete particles of a water-insoluble, cross-linked polymeric hydrogel, while Claim 11 specifies that such hydrogel must be selected from "the group consisting of hydrolyzed acrylonitrile grafted starch, acrylic acid grafted starch, polyacrylate, co-polymers of isobutylene and maleic anhydride, and mixtures thereof, said particles having an average particle size of from about 50 microns to about 1 mm."

[Young 24: 4–5; PX 1]

### 3. Claim 21

56. Claim 21 reads as follows:

A process for making a flexible, substantially unbonded, absorbent structure, comprising the following steps:

(a) dry mixing of hydrophilic fibers and particles of a water-insoluble, cross-linked polymeric hydrogel in a weight ratio of from about 75:25 to about 90:10, said particles having an average size of from about 50 microns to about 1 mm, and said cross-linked polymeric hydrogel being selected from the group consisting of hydrolyzed acrylonitrile grafted starch, acrylic acid grafted starch, polyacrylates, copolymers of isobutylene and maleic anhydride, and mixtures thereof to form a fiber/hydrogel mixture having a moisture content of less than 10% by weight;

(b) air-laying of the mixture obtained in step (a) into a web; and

(c) compressing the web into a density of from about 0.15 to about 0.6 g/cm³ and a Gurley Stiffness value of less than 2 grams.

[PX 1]

57. Claim 21 differs from Claim 11 in that it is a process claim as opposed to a product claim. In effect, Claim 21 describes a process for making the absorbent structure described in Claim 11. The process involves:

(a) dry mixing fluff and superabsorbent material;

(b) airlaying the mixture; and

(c) compressing the resulting web to within the specified density range.

[Young 25: 12; PX 1]

#### 4. Claim 24

58. Claim 24 reads as follows:

A disposable diaper, comprising:

(a) a liquid impervious backing sheet;

(b) a hydrophobic top sheet;

(c) an absorbent structure according to claim 1, said structure being placed between the backing sheet and the top sheet.

[PX 1]

59. In effect, Claim 24 merely involves taking the absorbent core design described in Claim 1 and putting it inside a diaper. [Young 24: 17; PX 1]

#### 5. Claim 27

60. Claim 27 reads as follows:

A disposable diaper according to claim 24 wherein the absorbent structure is wrapped in envelope tissue.

[PX 1]

61. In effect, Claim 27 simply involves taking the diaper described in Claim 24 and wrapping the absorbent core in tissue. [Young 24: 24]

#### 6. Claim 30

62. Claim 30 reads as follows:

A disposable absorbent product according to claim 24 wherein the absorbent structure is hourglass-shaped.

[PX 1]

63. In effect, Claim 30 simply involves taking the diaper described in Claim 24 and making the absorbent core in an hourglass shape. [PX 1]

64. It is clear that Weisman and Goldman and P & G do not claim that the Weisman patent teaches many of the applications of the those absorbent cores described in Claims 1 and 11 and manufactured by the process described in Claim 21. In other words, P & G does not allege that Weisman and Goldman invented a disposable diaper consisting of an absorbent core, a liquid impervious backing sheet and a hydrophobic top sheet. Nor do they allege that they invented wrapping such a diaper core in tissue. Finally, P & G does not allege that Weisman and Goldman invented the hourglass-shaped disposable diaper. Claims 24, 27, and 30 are unique, if at all, only to the extent that Claim 1 describes a unique structure. In other words, the only alleged novelty with respect to Claims 24, 27, and 30 is the absorbent structure of Claim 1 which is incorporated into those claims by reference.

### IV. The inequitable conduct defense

65. K–C's inequitable conduct defense is primarily based on the aforementioned Thompson declaration. K–C contends that the Thompson declaration was false or at best misleading, that the declaration was material to the patent prosecution, and that P & G submitted the Thompson declaration with the intent to mislead the patent office. K–C relies heavily on testing done by Weisman and Hartwell in 1983 which arguably contradicted the affidavit submitted by P & G to the PTO in 1986.

#### A. *The truth or falsity of the Thompson declaration*

66. As noted earlier, the Thompson declaration concludes:

[T]he Table I data show that web structures prepared by densifying airlaid hydrogel/fiber mixtures which have been moisturized are relatively stiff and inflexible as indicated by their Gurley Stiffness values which in general are significantly above 2.0 grams.

(DX 1). These assertions form the basis of K–C's claim that the declaration is false and/or misleading.

67. K–C argues that the conclusion is false or misleading because, in 1985, Hartwell tested moisturized samples of CLD/fluff and did not test moisturized samples of Sanwet IM–1000/fluff. The moisturized samples that Hartwell did test exhibited Gurley Stiffness values of 3.01 to 5.88 grams—significantly above the 2.0 grams limitation taught by the Weisman patent. Thompson did not limit his conclusion, however, to moisturized mixtures of CLD and fluff. Rather, he concluded that densified hydrogel/fiber mixtures which have been moisturized are relatively stiff. [DX 1]

68. K–C argues that this conclusion is false based on tests conducted by Hartwell and Weisman in 1983. Prior to March 1983, when the initial patent application was filed, the patent attorney then responsible for the prosecution of the Weisman patent application, Jacobus Rasser, brought the Schoggen patent to Weisman's attention.

69. At some point after the initial filing, more specifically between April and June 1983, Weisman and Hartwell conducted testing on Schoggen structures to determine the effect of bonding on a densified hydrogel/fluff absorbent structure. Significantly, although Weisman purported to be duplicating Schoggen, he tested moisturized samples of both CLD/fluff mixtures and Sanwet IM–1000/fluff mixtures.

70. On April 4, 1983, Weisman sent a letter to his supervisor, Trevor Walker, and explained the results of his testing of the Schoggen samples. With respect to the Gurley Stiffness values of the Schoggen samples, Weisman concluded:

> Gurley Stiffness values ... show the low moisture, blend technology material does have the lowest level of stiffness, but the humidified samples have only a slightly higher level of stiffness. The Schoggen samples in fact fall within our claimed

range of < 2.0 g of stiffness. But, one must consider the highly plasticized state of the humidified samples. The plasticizing effect water plays upon cellulose type fibers is well known in paper-making art. The samples were tested in the humidified state and consequently the fibrous members of the web were in a very plasticized state. Such a sample would not exhibit very stiff bulk properties. Upon drying, a stiff response would be expected; most likely on the order of those observed for the Flexible Absorbent Board. But, the Schoggen art does not require the drying step.

(PX 1177). Weisman's testing also revealed that the bonding which was caused by compression in a relatively humidified state "inhibits the ability of the absorbent structure to wick and expand in the early stages of wetting." The conclusions which Weisman sent to Walker refer only to the fluff/CLD samples apparently because he had not yet conducted the fluff/Sanwet tests.

71. In May 1983, Hartwell conducted partition tests on three fluff/Sanwet mixtures which were densified at 30% moisture and then oven-dried to an unspecified moisture level. Hartwell noted on the graphs of the partition tests that the Gurley Stiffness values for the three samples were 1.29, .31, and 1.47 $g/cm^3$, respectively. [DX 231, DX 253, DX 254]

72. In June 1983, Weisman did some additional Gurley Stiffness testing in an apparent attempt to confirm his assertion to Walker that the structures which exhibited low Gurley Stiffness values when wet would become stiff when dried. Weisman tested three types of structures: 1) 100% Foley fluff, 2) Foley/CLD in a ratio of 75/25, and 3) Foley/Sanwet in a ratio of 84/16. The structures were moisturized to 30% moisture, pressed to .3 $g/cm^3$, and then dried to the specified moisture levels. The data reported by Weisman was as follows:

| Moisture Level At Test (%) | Gurley Stiffness (All in g) | | |
|---|---|---|---|
| | 100% Foley | 75/25 Foley/CLD | 84/16 Foley/Sanwet |
| 30 | 0.99 | 0.54 | 0.57 |
| 25 | 0.66 | 0.73 | 0.91 |
| 20 | 1.06 | 0.99 | 1.05 |
| 15 | 0.79 | 1.45 | 1.09 |
| 10 | 1.58 | 2.25 | 1.74 |
| 5 | 2.03 | 2.89 | 1.24 |

[DX 2]

73. It is obvious from this data that Weisman was correct in his assertion to Walker that the Foley/CLD blends became stiff when they dried. However, this conclusion did not apply to the Foley/Sanwet blends as is evidenced by the above data. In fact, the Foley/Sanwet blend densified at 30% moisture and then dried to 5% exhibited a Gurley Stiffness value within the range of the Weisman patent application.

74. It is clear based on the tests conducted by Weisman and Hartwell that the conclusion of the Thompson declaration is inaccurate because it is too general. The Weisman/Hartwell data reveals that the conclusion drawn by Thompson depends on the type of superabsorber used in the hydrogel/fluff mixtures to which Thompson referred. Thompson's declaration does not disclose this dependency to the examiner and is, therefore, false.

75. The court has considered P & G's argument that the context in which the conclusion was presented—with the data showing *only* dried structures of CLD/fluff—clarifies any misleading tendency of the conclusion. However, the data in the Thompson declaration also includes Gurley Stiffness values for a Sanwet/fluff mixture which was densified with a moisture content of less than 10%. Following the assertion about the relative stiffness of structures densified at high moisture content, Thompson continued:

[T]he Table I data further show that web structures prepared by densifying air-laid hydrogel fiber mixtures which are relatively dry (moisture content less than 10% by weight) are relatively flexible as indicated by their Gurley Stiffness values which are significantly below 2.0 grams.

Thus, Thompson used mixtures of CLD/fluff *and* Sanwet/fluff to support the apparently true assertion about the flexibility and Gurley Stiffness values of structures densified at low moisture contents. Contrarily, he relied solely on tests of CLD/fluff to support the false assertion that hydrogel/fluff mixtures densified at relatively high moisture levels are, in general, comparatively stiff.

76. The juxtaposition of these two conclusions in combination with the Table I data does not eradicate the misleading nature of the declaration. Rather, the two conclusions along with the data tend to enhance the misleading character of the Thompson declaration. George Allen prepared the Thompson declaration for Thompson's signature.

77. In sum, the court finds the conclusion of the Thompson declaration is false, and finds that the presentation of the accompanying data does not eradicate the misleading nature of that conclusion.

B. *The materiality of the Thompson declaration*

78. Allen presented the Thompson declaration in response to the July 15, 1985 rejection of all claims of the Weisman patent application. The Examiner rejected the claims as being obvious in light of Schoggen and Schoggen in view of Torr. Two conclusions contained in the rejection notice are of particular moment. First, the Ex-

aminer indicated her belief that the moisture content of the absorbent structures is a non-critical parameter of the invention. Second, she concluded, "Applicant argues that Schoggen produces a bonded structure. There is nothing in Schoggen or in Applicant's claims that distinguishes one from the other."

79. Based on this rejection notice, Allen told the Examiner that he could distinguish Schoggen by showing that moisture was indeed a critical parameter of the invention. He proposed to show moisture's criticality by providing comparative Gurley Stiffness data. He did not propose to submit data such as tensile strength test results or burst tests results which might have more directly shown the difference between the bondedness of the structures.[8] Nor did he provide any data indicating the effect of bonding on the absorptive ability of the structure. Weisman and Hartwell had conducted this type of testing in 1983.

80. The Examiner then indicated that provision of such data would distinguish Schoggen and be applicable to Torr because Torr also required moisturization of the absorbent structure. Although P & G argues that the Examiner merely wanted to see evidence distinguishing the Weisman invention from Schoggen, her statement that such evidence would also distinguish Torr shows that she wrongly assumed that the effect of moisturization would be similar no matter what type of polymer was placed in the absorbent structure. (DX 162, p. 176). In Allen's testimony concerning the interview with the Examiner in August 1985, he stated:

> The Examiner then replied that we did not need to do comparative testing directly with Torr, because she would take evidence of the Schoggen phenomenon as evidence that Torr could likewise be distinguished *for similar reasons*.

(Allen 28: 33) (Emphasis supplied). Thus, after the August 1985 interview, Allen knew that the Examiner had assumed that

the effect of moisture content on the absorbent structures was not polymer specific because Torr taught polymers not included within Schoggen. [Allen 28: 33; DX 162 at p. 176]

81. In fact, the testing done by Weisman and Hartwell in 1983 showed the exact opposite—that the effect on Gurley Stiffness of the moisture content at the time of compression was polymer specific. Had P & G supplied the Weisman/Hartwell 1983 data, the Examiner would have then realized that she erred when she assumed that the effect of moisturization on the absorbent structure was unrelated to the type of polymer used.

82. The Torr patent taught the use of "cold-water-swelling starch such as pre-gelatinized starch or a chemically modified starch" and of "highly water-absorbent polymeric materials which form gels quickly on contact with large amounts of water." (DX 20, col. 3, lns. 17–18, 21–22) Sanwet IM–1000 was composed of "cross-linked *starch*-grafted polyacrylates made from *starch* and acrylic acid," and it was a highly water-absorbent polymeric material which formed gel quickly on contact with large amounts of water. (DX 28 at 65469, emphasis added) [DX 20, col. 3, lns. 17–18, 21–22; DX 28 at 65469]

83. Even if one disregards the Torr patent, however, substitution of Sanyo's Sanwet IM–1000 for CLD in a Schoggen-type absorbent structure was particularly obvious. This obviousness is evidenced most graphically by Weisman's and Hartwell's having themselves chosen to substitute Sanwet IM–1000 for CLD when they sought to replicate the Schoggen patent in the course of the 1983 testing. Indeed, the Weisman/Hartwell test results contain several pages of data headed "Duplication of Buckeye Patent"[9] that described mixtures of fluff and Sanwet IM–1000. In other words, Weisman, who is skilled in the art, found it obvious to substitute Sanwet IM–1000 for CLD in his duplication of the

---

8. The Schoggen patent does not mention Gurley Stiffness testing. It does, however, mention tensile testing and burst testing.

9. The "Buckeye Patent" was the P & G term for the Schoggen patent. Schoggen was employed in the Buckeye Cellulose Corporation, a wholly-owned subsidiary of P & G.

Schoggen structure. [DX 231; DX 253; DX 254]

84. Moreover, the prior art clearly taught the substitution of Sanyo's Sanwet IM–1000 for other superabsorbent polymers. A 1981 report published by Marketing/Technology Service of Kalamazoo, Michigan expressly stated that "[o]ne superior superabsorbent product is offered by Sanyo Chemical in Japan." (DX 115, Section VI at p. 68) The report singled out no other superabsorbent material as being particularly outstanding. [DX 20, col. 3, lns. 17–18, 21–22; DX 115, Section VI at p. 68; DX 162 at p. 175; DX 231; DX 253; DX 254]

85. The Thompson affidavit obviously convinced the Examiner that her concerns about the criticality of moisture content in the Weisman invention were unfounded. After Allen submitted the Thompson declaration and amended the claims of the patent to include a Gurley Stiffness value limitation, the Examiner agreed that all claims of the patent should be allowed.

86. P & G argues that the Thompson affidavit was immaterial because it was submitted to show the Examiner that the Schoggen and Torr structures were bonded. P & G points out that Schoggen and Torr do, in fact, teach bonded structures. Therefore, even if the Thompson declaration was inaccurate in its conclusion concerning Gurley Stiffness of fluff/hydrogel structures, the declaration was not material because the Schoggen and Torr structures could, in actuality, be distinguished from Weisman structures.

87. The court cannot accept this argument. P & G prosecuted the patent. Allen, with the Examiner's approval, chose the tests P & G would conduct in order to distinguish Schoggen and Torr. The Examiner obviously relied on these test results in deciding to allow the claims of the Weisman patent. The data was submitted to overcome a legitimate and reasonable concern of the Examiner concerning the criticality of moisture content, and the Thompson declaration inaccurately reported the impact on Gurley Stiffness of the moisture content at the time of densification. This court cannot excuse a false declaration based on P & G's after-the-fact assertion that it could have legitimately addressed the Examiner's concerns by presentation of information not previously supplied to the PTO.

88. In sum, the court finds that the Thompson declaration was material to the prosecution of the Weisman patent application. The court finds further that a reasonable examiner who was told that a structure would be distinguished by comparative data is certainly justified in relying on the accuracy of that data. In this case, the Examiner was told that Schoggen and Torr would be distinguished by comparative Gurley Stiffness data, and she reasonably relied on the accuracy of that data.

## C. Facts relevant to P & G's intent to deceive the PTO

89. George Allen testified that he did not see the comparative testing of the Schoggen and Weisman structures prior to the issuance of the patent. Thus, it is clear that he also claims he did not see those results prior to his interview with the Examiner in August 1985. [Allen 28: 36]

90. There is no evidence that P & G conducted other comparative testing of Schoggen and Weisman structures prior to Allen's August 1985 interview with the Examiner. Thus, Allen did not rely on any prior testing when he told the Examiner that Schoggen could be distinguished from Weisman based on comparative Gurley Stiffness data.

91. The tests which Hartwell conducted in 1985 were designed by Allen. He told Hartwell and Thompson the specific webs which they were to test, and he did not request any tests of Schoggen structures which used Sanwet IM–1000. Allen decided what should be put in the Thompson declaration, and he authored the language that follows the Table I data in the Thompson declaration. [Allen 28: 33–34]

92. Apparently, it was not uncommon at P & G for lawyers to design tests to assist in the prosecution of patent applications. In August, 1984, P & G employee D.A.

Nicholson wrote a memorandum to Allen Early, a senior P & G executive in the research and development area. The memorandum discussed how P & G could accelerate its invention rate. A copy of the memorandum was sent to Paul Weisman and to George Allen's boss, Steven Goldstein. In the course of the memorandum, Nicholson wrote:

[L]awyers can make outstanding inventors out of average scientists. They can spot potential inventions where the scientist might not. *They are especially adept at suggesting experiments which support applications* and/or suggest [sic] new inventions lurking just around the corner. They know the process.

(DX 315) (emphasis added). [DX 315; Goldstein 18: 144]

93. Leonard Thompson was the scientist who swore to the accuracy of the declaration. In his deposition, he succinctly summarized his participation in the preparation of the declaration: [10]

A. I looked over the data that Eddie [Hartwell] had given me and made sure it was accurate and consistent with what George [Allen] had asked us to do, and transmitted that data to George Allen.
Q. All right. And then Mr. Allen prepared the declaration—
A. That's right.
Q. —and sent it to you for review?
A. Yes.
Q. And having reviewed it, did you decide it was accurate?
A. Yes.
Q. And then you signed it and returned it to Mr. Allen; is that correct?
A. Yes.

\* \* \* \* \* \*

Q. All right. Did you make any changes in the declaration that was sent by Mr. Allen to you?

\* \* \* \* \* \*

A. I don't recall.
[Thompson 27: 450–451]

94. Allen testified that he generally tried to keep the inventors involved in the patent prosecution. In particular, Allen said that he continued to communicate with Paul Weisman after Weisman moved to the Food and Beverages Division. [Allen 18:73; Allen 28: 53, 93]

95. Seven days after the July 15, 1985 rejection, Allen sent Weisman, Goldman, Allen Early, and Steven Goldstein a memo which included a copy of the rejection notice and mentioned prospective testing to distinguish the cited prior art. At that time, Early was director of the tissue and disposables technology division at the Miami Valley Laboratory, and Goldstein was senior patent counsel at the Miami Valley Labs. [Privileged Document 35; DX 649; Schaeffer 18: 210–219; Allen 28: 53–54]

96. Weisman, Early and Goldstein each sent the memo back to Allen with handwritten notes telling him about the 1983 tests. In fact, Goldstein sent Allen two notes informing him of the 1983 testing. P & G has claimed the attorney-client privilege with respect to each of these communications, so the exact contents of the handwritten notes is not known. It is clear, however, that Allen knew prior to submitting the Thompson declaration to the PTO that Weisman and Hartwell had done earlier comparative testing of Schoggen structures. Allen also knew that Weisman, Early and Goldstein felt the 1983 testing was relevant to P & G's attempt to overcome the most recent rejection of the Weisman patent claims. [Allen 28: 57–58; Goldstein 18: 202–205]

97. Goldstein never ascertained if Allen found the 1983 test data. Goldstein testified, "[O]nce I brought something like that to an experienced attorney's, like Mr. Allen's, attention, it required no further follow-up." Allen testified at trial that he had been practicing patent law for "almost 20 years." Goldstein's testimony infers that he felt Allen should have at the very least ascertained the results of the Weisman/Hartwell tests prior to submission of a declaration the PTO. [Goldstein 18: 196–198; Allen 28: 8]

**10.** The questions are propounded by V. Bryan Medlock, Esq., an attorney for K–C.

98. Allen has maintained throughout his testimony that he never found the 1983 data prior to submitting the Thompson declaration to the PTO. He looked through some of the files which he inherited from Rasser including the files associated with the parent and child applications filed in the patent office relating to the Weisman patent. He did not find the 1983 data in either of these files. [Allen 28: 35]

99. Allen did not contact Weisman or Hartwell to determine where he might find results of the tests. He did not request Weisman's lab notebook which showed at least one sample of Foley/Sanwet IM-1000 in a ratio of 84/16 which was densified at 30% moisture content and oven dried. This sample exhibited a Gurley Stiffness value of 1.29 grams. [Allen 28: 58–59, 60]

100. Allen testified at the trial in P & G's rebuttal to K–C's case. The court finds the following testimony of Allen very instructive as to how easily Allen may have obtained the 1983 test data even absent a search of the files: [11]

Q. So you looked through the parent and child files, but you didn't look through the grandparent file?

A. That is correct.

Q. Now, not having been able to locate it in the files, did you pick up the phone and call Mr. Weisman and inquire, Paul, you have told me about this 1983 data. Where can I find it?

A. No, I did not.

Q. Do you know whether or not that data resides in laboratory notebooks of Procter & Gamble in the name of either Paul Weisman or his lab technician, Edward Hartwell?

A. I know now whether they do, yes.

Q. Were those lab notebooks available to patent attorneys at Procter & Gamble by request?

A. I suppose they would be.

Q. Those lab notebooks are kept by Procter & Gamble at the Miami Valley Laboratory's technical library, aren't they?

A. I am not sure where they are kept. The active ones are probably still with the individuals.

Q. What about the ones that have been completely closed, that is the lab books that have been totally filled out and turned in. Where are those kept?

A. I think those are microfilmed and sent to a central location.

Q. Are those available to you by simple request?

A. I suppose if you know what to request.

Q. How would you obtain, if you desired it, laboratory notebooks of Paul Weisman? Could you simply request Weisman's laboratory notebooks, and your library would find them for you?

A. I suspect so, yes.

Q. If you wanted Eddie Hartwell laboratory notebooks, wouldn't you simply give the laboratory librarian the name of Mr. Hartwell and they would turn up for you his lab books?

A. I think that's correct.

Q. But you did not go to that effort in 1985, following the July 15th rejection, to locate either Mr. Weisman's notebooks or Mr. Hartwell's notebooks that might have to do with the '83 testing, did you?

A. No. I had no need to.

Q. And you did not call Mr. Weisman nor did you call Mr. Hartwell to inquire about that data, did you?

A. I had no need to get the data.

[Allen 28: 58–60]

101. After the commencement of this action, P & G located the Weisman/Hartwell test data in the file associated with the grandparent application. The grandparent application was pending in 1983 when Weisman and Hartwell conducted comparative testing in response to Rasser's having brought the Schoggen patent to Weisman's attention. [Allen 28: 35–36]

102. At the August 14, 1985 interview, Allen told the Examiner that Schoggen would be distinguished by comparative testing, even though the only comparative testing that had been done at the time was the Weisman/Hartwell 1983 testing. Dur-

---

**11.** The questions are once again propounded by Mr. Medlock.

ing his deposition, Allen testified that his statements to the Examiner were based in part on communications with Weisman and Early before the interview. Specifically, Allen testified the he "recalled discussing" this subject with Weisman. He also said that "I think I discussed the issue with Al Early." However, at the trial, Allen testified that he had "no specific recollection" of "any such discussion" with Weisman, other than Weisman's handwritten note on Allen's memo reporting on the July 15, 1985 rejection. [Allen 18: 78–81; Allen 28: 60–63]

103. Allen's knowledge of the 1985 testing is not in dispute. Allen devised the tests to be done in connection with the Thompson Declaration and drafted the declaration. [Thompson 27: 436–437; Allen 18: 115; Allen 28: 26–27, 33; DX 1958]

104. If Allen knew of the results of the 1983 Gurley Stiffness tests, his failure to call those results to the attention of the PTO evidences an obvious intent to mislead.[12]

105. If Allen did not know the results of the 1983 test data, he should have known them and was grossly negligent in failing to ascertain those results. At the very least, Allen's search for the test data should have included examination of the files which formed the history of the Weisman invention. In other words, Allen should have searched the child, parent and grandparent files for the 1983 data.

106. Furthermore, if Allen could not find the data, he should have inquired of Weisman or Hartwell what the results of the tests were and where such results could be found.

107. Allen's testimony that he did not need to find the data is incredible. After seeing copies of the July 15 rejection and after being informed of Allen's proposed tests to overcome the rejection, the director of the tissue and disposables technology division at the Miami Valley Laboratory, the senior patent counsel at P & G, and the inventor himself each told Allen that prior testing had been conducted. Each of these learned gentleman obviously felt that the 1983 data was relevant to the inquiry prompted by the Examiner's rejection. The inventor who had conducted the 1983 testing and presumably was very familiar with its contents felt it was important to bring the testing to Allen's attention at this particular phase of the patent prosecution. Allen's singular conclusion made without benefit of having seen the data that the 1983 test results were not important and that he "had no need to get the data" flies in the face of reason.

108. In sum, the court finds that Allen's failure to locate or learn the results of the 1983 testing evidences gross negligence on his part. Although there is some evidence of Allen's good faith, i.e. he did disclose the Schoggen patent to the PTO, this evidence is outweighed by his failure to heed the call of Weisman, Early, and Goldstein that the 1983 test results were pertinent to his attempts to distinguish the Schoggen patent from the Weisman invention.[13]

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338. Ven-

---

**12.** There is little or no direct evidence that Allen had actual knowledge of the 1983 test results prior to filing the Thompson declaration. He did testify, however, that he told the Examiner exactly what webs he would compare and that "those would be the comparisons that would be effective to prove to her that we were, in fact, patentably distinguishable from Schoggen." [Allen 28: 24–25]. Allen's ability to specify the exact webs to be tested and to accurately predict the results of the tests without his having ever seen any Gurley Stiffness values for Schoggen structures and without having discussed the proposed testing with Weisman is, at best, suspicious.

**13.** Conspicuously absent from the findings of fact are any findings relevant to the issues of infringement, anticipation and obviousness. Because the court has found that P & G submitted a false affidavit to the PTO with the intent to deceive, the patent will be declared unenforceable. This declaration renders the issues of anticipation, obviousness and infringement moot despite defendant's counterclaim for a declaratory judgment that the patent is invalid and not infringed. *See* Conclusion of Law 24. Furthermore, the court has not considered any of the exhibits to which plaintiff tendered objections. Therefore, no ruling on the admissibility of these exhibits is necessary at this time.

ue in this district is provided by 28 U.S.C. § 1400(b).

## II. Inequitable conduct

### A. *Duty of candor*

■ 2. Attorneys prosecuting patent applications before the PTO owe a duty of absolute candor and good faith to the PTO. This duty is outlined in 37 C.F.R. § 1.56 (Rule 56) which provides in pertinent part:

> (a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such persons have a duty to disclose to the Office such information they are aware of which is material to the examination of the application.... The duty is commensurate with the degree of involvement with the preparation or prosecution of the application.

3. George Allen was intimately involved with, and was in fact singularly responsible for, the prosecution of the Weisman patent application. Commensurate with this degree of involvement, he owed the highest duty of candor to the PTO.

4. Rule 56 implements a policy long recognized by the United States Supreme Court:

> A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machining Co.,* 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945).

■ 5. A Rule 56 actor may violate the duty of candor by an act of omission or commission. The United States Court of Appeals for the Federal Circuit has recognized:

> Conduct before the PTO that may render a patent unenforceable is broader than "common law fraud." ... It includes failure to disclose material information, or submission of false material information, with an intent to mislead.

*J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir.1984).

6. As recognized earlier at footnote 1, a finding of inequitable conduct renders a patent unenforceable for the life of the patent. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1561 (Fed.Cir. 1984).

### B. *Elements of inequitable conduct defense*

7. In assessing inequitable conduct, the courts have traditionally weighed two factors:

a. the materiality of the misstatement or omission; and

b. whether the misstatement or omission was intentional.

The Federal Circuit Court of Appeals has held:

> To sustain a claim of inequitable conduct, the alleged infringer must show by clear and convincing evidence that (1) the nondisclosed information would have been material to the patent examiner, and (2) the nondisclosure was intentional. These two elements must be balanced against each other, and if one is particularly strong, a lesser degree of the other may suffice to show inequitable conduct.

*Under Sea Industries, Inc., v. Dacor Corporation,* 833 F.2d 1551 (Fed.Cir.1987).

■ 8. In order to establish inequitable conduct on the part of an applicant or his attorney, K–C must prove that the inventor

or his attorney had actual knowledge of its falsity or an obligation to know it. *Jaskiewicz v. Mossinghoff*, 822 F.2d 1053, 1058 (Fed.Cir.1987). The court recognized, "Mere negligence is not sufficient to infer fraud or dishonesty though gross negligence may lead (in proper circumstances) to a finding of inequitable conduct." *Id.*

9. It is not always necessary to show that the applicant or his attorney had actual knowledge of the materiality of any information which he failed to disclose to the PTO. In *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1415 (Fed.Cir. 1987), the court noted:

> [A]n applicant who knew of the art or information cannot intentionally avoid learning of its materiality through gross negligence, i.e., it may be found that the applicant [14] "should have known" of that materiality.

(Footnote not in original).

10. The court cannot, however, find intent to deceive based solely on a finding of gross negligence. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed.Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). The Federal Circuit elaborated on this conclusion as follows:

> We adopt the view that a finding that particular conduct amounts to "gross negligence" does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.

*Id.* at 876.

11. Where the factor of materiality is clear, however, it is:

> difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish

inequitable conduct) will not suffice in such circumstances.

*FMC Corp.*, 835 F.2d at 1416.

12. Information is material to the prosecution of a patent when "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a).

13. It is not necessary for a defendant asserting inequitable conduct on the part of the plaintiff to establish that the patent would not have issued *but for* the inequitable conduct. In *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418 (Fed.Cir.1989), the district court had found that the plaintiff committed inequitable conduct based on its failure to disclose certain prior art. The district court also found that the same prior art did *not* render the patented invention obvious. On appeal, the plaintiff argued that the finding of non-obviousness precluded a finding of materiality. The Court of Appeals disagreed, noting:

> [Plaintiff] wrongly presupposes a "but for" standard of materiality. Materiality may be established, as it was here, by a showing that a reasonable examiner would consider the prior art in deciding whether to issue the patent.

*Id.* at 1421.

14. When an applicant makes a false statement in a declaration submitted to the Patent Office in order to overcome the rejection of a patent application, the requisite materiality is presumed. As the court stated in *Donaldson Co., Inc. v. Pneumafil Corp.*, 617 F.Supp. 1428, 1441 (D.N.C.1985), *aff'd in relevant part*, 824 F.2d 979 (Fed.Cir.1987):

> When as in this case, affidavits are submitted with the purpose of overcoming objections and prior-art rejections entered by the examiner, and the rejections are thereafter withdrawn in response to the affidavits, it is clear that the affidavits and misrepresentations made therein

---

**14.** The court used the term "applicant" to include "the patentee and the attorney who prosecuted the application that resulted in the patent-

in-suit, because the knowledge and actions of applicant's attorney are chargeable to applicant." *FMC Corp.* at 1415 n. 8.

affecting the examiner's decision are material.

In the words of the Federal Circuit: "[T]here is no room to argue that submission of false affidavits is not material." *Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1571 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

■ 15. A finding of inequitable conduct on the part of a patent applicant must be established by clear and convincing proof. *FMC Corp.*, 835 F.2d at 1415.

## C. The Law as Applied to the Findings of Fact

■ 16. P & G through attorney George Allen submitted the Thompson declaration to overcome the Examiner's concern that the moisture content of the Weisman structure at densification was non-critical. In order to show the criticality of the moisture content, the Thompson data asserted that fluff/hydrogel mixtures which were densified with moisture contents greater than ten percent generally exhibited Gurley Stiffness values greater than 2 grams. This assertion was not true. The data contained in DX 2 reveals that, in fact, the Gurley Stiffness of densified fluff/hydrogel mixtures is polymer specific. The Thompson declaration had the desired effect on the Examiner—she allowed the claims after receiving declaration. Obviously, the Examiner relied on the Thompson declaration in deciding to allow the claims of the Weisman patent.

17. Furthermore, the court finds that the test results obtained by Weisman and Hartwell in June 1983 should have been disclosed to the PTO. These results would have at least allowed the Examiner to conclude for herself whether the broad statement contained in the Thompson declaration was accurate. In fact, the 1983 test data confirms that the conclusion of the Thompson declaration is inaccurate.

18. George Allen was intimately familiar with the Thompson declaration and the tests on which it was based. He was grossly negligent in failing to locate the 1983 test data. Weisman, Goldstein and Early had all indicated to Allen that the information was pertinent to overcoming the Examiner's rejection. Allen's testimony that he did not conduct an exhaustive search for the 1983 test data was that he did not need to find the data. This conclusion made by Allen without the benefit of having seen the 1983 test data and despite the urging of Weisman, Early and Goldstein evidences a conscious intent on behalf of Allen to bury his head in the sand concerning the 1983 test data. Allen should have located the 1983 test data and was grossly negligent in failing to do so. As the Federal Circuit has noted:

> [O]ne should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art.

*FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526 n. 6 (Fed.Cir.1987).

19. The conduct in *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873 (Fed.Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989), involved the transfer of numerous claims *en masse* from a parent to a continuing application. Twenty-two claims in the parent application had already been allowed. In listing the claims in the continuing application which corresponded to the previously granted claims in the parent application, the patent applicant incorrectly indicated that claim 43 in the continuation application corresponded to allowed claim 50 in the parent application. As the court explained:

> In preparing and filing the continuation application, a newly-hired counsel for [the patent applicant] had two versions of "claim 50" in the parent application, an unamended rejected version and an amended allowed version. As is common, counsel renumbered and transferred into the continuation all (here, 22) claims "previously allowed". In filing its claim 43, it copied the "wrong", i.e., the rejected, version of claim 50. That error led to the incorrect listing of claim 43 as corresponding to allowed claim 50 and to

incorporation of claim 43 as claim 9 in the patent. In approving the continuation for filing, [the patent applicant's] regular attorney did not, as the district court said, "catch" the mistake. *Id.* at 873. The applicant's mistake was an innocent ministerial error; experts for both parties testified that "they saw *no* evidence of deceptive intent." *Id.* at 872 (emphasis added). The innocent ministerial error in *Kingsdown Medical Consultants,* which the Examiner could readily have discovered from a comparison of papers actually on file in the Patent Office, is quite different from the misconduct in this case, which was not innocent and was not discoverable by the Examiner.

20. The court has considered the evidence, including the slight evidence of good faith on Allen's behalf, and finds that Allen's "conduct, viewed in light of all the evidence, including evidence indicative of good faith, ... indicate[s] sufficient culpability to require a finding of intent to deceive." *See Kingsdown Medical Consultants,* 863 F.2d at 876.

21. The finding of intent to deceive is bolstered by the highly material nature of the false affidavit. This court cannot imagine a more reasonable course of action than for an Examiner to rely on the accuracy of an affidavit specifically designed to overcome her previous rejection. Furthermore, the court cannot imagine a more material representation than a declaration submitted specifically to overcome a prior art rejection.

22. When the court balances the two elements of the inequitable conduct defense, the materiality of the Thompson declaration weighs heavily, and the weight of the evidence on intent to deceive is certainly sufficient to amount to clear and convincing evidence in favor of a finding of inequitable conduct.

23. P & G, through its attorney George Allen, committed inequitable conduct before the PTO. The patent-in-suit, United States Patent No. 4,610,678, is, therefore, unenforceable for the life of the patent.

24. The finding of unenforceability renders the questions of anticipation, obviousness and infringement moot. In *A.B. Dick Co. v. Burroughs Corporation,* 798 F.2d 1392 (Fed.Cir.1986), the court addressed cross-appeals. The patent owner, A.B. Dick Company, appealed the finding of the lower court that its patent was unenforceable as a result of inequitable conduct before the PTO. Burroughs Company appealed the findings that the patent was not invalid and infringed. The court first affirmed the finding of inequitable conduct and then dismissed Burroughs' appeal based on a finding that the issues presented therein were moot. Similarly, in *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553 (Fed.Cir.1984), the court affirmed a finding of inequitable conduct and then refused to address the questions of validity and infringement on grounds of mootness. This court agrees that the finding of unenforceability of the patent in suit renders the questions of validity and infringement moot.

III. Conclusion

Based on the foregoing findings of fact and conclusions of law, it is

ORDERED, that United States Patent No. 4,610,678 be, and the same is. hereby, declared unenforceable. It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the defendant, Kimberly–Clark Corporation, and against the plaintiff, the Procter & Gamble Company, on the claims of the plaintiff. It is

ORDERED FURTHER, that the Clerk of Court enter judgment in favor of the defendant Kimberly–Clark Corporation and against the plaintiff the Procter & Gamble Company on defendant's counterclaim for a declaratory judgment that United States Patent No. 4,610,678 is unenforceable. It is

ORDERED FURTHER, that the January 4, 1988, stay of the discovery on Kimberly–Clark Corporation's antitrust counterclaim [15] be, and the same is hereby, vacat-

---

**15.** In his January 4, 1988 order, Magistrate Carr

also stayed discovery on K–C's third affirmative

**1200**

ed, and the parties are ordered to proceed with the discovery on that counterclaim in accordance with the scheduling order filed contemporaneously with this order.

AND IT IS SO ORDERED.

defense. Because the court found in favor of K–C on its fourth affirmative defense, discovery on K–C's third affirmative defense need not proceed.